## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JASMINE BRETTO and NAOMI KOPINSKY, individually and on behalf of those similarly situated,<br><br>          Plaintiffs,<br><br><br>   vs.<br><br><br>AMC ENTERTAINMENT HOLDINGS, INC.,<br><br>          Defendant. | CASE NO.<br><br>COMPLAINT - CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

### CLASS ACTION COMPLAINT

Plaintiffs Jasmine Bretto and Naomi Kopinsky (together, "Plaintiffs"), individually and on behalf of the class defined below (the "Class"), through their undersigned counsel, bring this Class Action Complaint against Defendant AMC Entertainment Holdings, Inc. ("AMC" or "Defendant").

1.      This is a class action suit brought against Defendant for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA").

2.      AMC operates under its trade name "AMC Theatres." AMC touts that it "is the largest theatre operator in the world," and that as of December 31, 2022, it reportedly owns, leases or operates 940 theatres and 10,474 screens in 12 countries, including 586 theatres with a total of 7,648 screens in the United States. AMC operates theatres located in 43 states and the District of Columbia, "with approximately 50% of the U.S. population living within 10 miles of one of [its] theatres." *See* https://www.sec.gov/Archives/edgar/data/1411579/000141157923000038/amc-20221231x10k.htm.

3.      AMC owns and operates a website, www.amctheatres.com (the "AMC Website"), where consumers can watch trailers, browse showtimes, and purchase movie tickets.

4.      The VPPA protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710. The VPPA defines a "video tape service provider" broadly, and under both the plain language of the statute and courts' interpretations of that language, AMC constitutes a "video tape service provider."

5.      "Personally identifiable information" ("PII") is defined by the VPPA as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

6.      AMC violates the VPPA by knowingly and intentionally disclosing consumers' PII when they purchase movie tickets on the AMC Website. Specifically, when a Facebook user is logged into Facebook and purchases a movie ticket on the AMC Website, AMC discloses to Facebook the name of the movie title the specific Facebook user purchased a ticket to see. Because many users stay logged into Facebook for prolonged periods of time, discovery will show that AMC has transmitted PII to Facebook in violation of the VPPA on thousands of occasions.

7.      The VPPA provides consumers whose privacy has been invaded with the right to recover statutory damages of $2,500 per violation, plus attorneys' fees and costs. Plaintiffs bring this action to achieve redress on behalf of themselves and others who were similarly injured by Defendant's unlawful conduct.

## PARTIES

8.      Plaintiff Jasmine Bretto is a citizen of Massachusetts and resides in Cambridge.

9.      Plaintiff Naomi Kopinsky is a citizen of Louisiana and resides in New Orleans.

10.     Defendant is a publicly traded corporation (NYSE:AMC) organized under the laws of Delaware and has principal offices at 11500 Ash Street, Leawood, Kansas 66211.

## JURISDICTION AND VENUE

11.     This Court has original federal question and subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227, *et seq.*, and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This action arises under the laws of the United States. Plaintiffs allege and believe that there are: i) 100 or more class members; ii) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and iii) at least one member of the plaintiff class is from a different state than the Defendant.

12.     This Court has personal jurisdiction over the parties because Defendant, at all times relevant hereto, has affirmatively established and maintained sufficient contacts with Kansas in that Defendant is registered to do business in this State, is headquartered in this State, and conducts significant business operations in this State.

13.     Venue is proper under 28 U.S.C. § 1391 inasmuch as the Defendant is based in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

## I.      THE VIDEO PRIVACY PROTECTION ACT

14.     The VPPA was passed in 1988. The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the *Washington City Paper* which then published that history. Congress responded by passing the VPPA with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what

they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

15.     The VPPA protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710. A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). The legislative history shows that "similar audio visual materials" is broad—the Senate Report noted that the term includes "laser disks, open-reel movies, or CDI technology." *See* S. Rep. No. 100-599, 100th Cong., 2d Sess., reprinted at 1988 U.S.C.C.A.N. 4342-1. This is not an exhaustive list.

16.     Courts have interpreted the VPPA to apply to modern technologies and "to cover more than just the local video rental store." *In re Vizio, Inc., Consumer Priv. Litig*., 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). Specifically, courts have found that "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved." *In re Hulu Priv. Litig*., No. 11-cv-03764 LB, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (citing S. Rep. No. 100-599 at 1).

17.     The VPPA "codifies a context-specific extension of the *substantive* right to privacy. . . . [I]t protects generally a consumer's substantive privacy interest in his or her video-viewing history." *Eichenberger v. ESPN, Inc*., 876 F.3d 979, 983 (9th Cir. 2017) (emphasis in original). "Accordingly, *every* disclosure of an individual's 'personally identifiable information' and video-viewing history offends the interests that the statute protects." *Id.* (emphasis in original).

18.     By selling tickets to prerecorded movies, which have traditionally been shown via open-reel technology, and delivering those movies to consumers in movie theaters, AMC is a "video tape service provider."

4

19.     By purchasing movie tickets, Plaintiffs and Class members are "consumers," as the VPPA defines that term. 18 U.S.C. § 2710(a)(1).

20.     Video tape service providers, including AMC, are prohibited from knowingly disclosing, to any person, information identifying any consumers as having requested or obtained specific video materials or services. Here, that means AMC cannot disclose to third parties information regarding the specific movies for which a consumer purchased tickets.

21.     The prohibition on disclosing this information extends to movie ticket purchases made online through AMC's virtual box office. Since the VPPA was passed, consumers have gone from purchasing tickets with cash at a movie theater to purchasing tickets from the comfort and privacy of their homes using the internet. Technological change has thus enabled movie theaters, such as AMC, to compile electronic records of transactions that associate specific consumers with the movies they are purchasing tickets for. Consumers' privacy interests in these records are protected by the VPPA because the systematic disclosure of such transactions causes the exact harms that spurred Congress to pass the VPPA in the first place: the movies that an individual expressed a private intention to watch being disclosed to a third party.

## II.     AMC'S KNOWING DISCLOSURE OF CONSUMERS' PII TO FACEBOOK THROUGH ITS WEBSITE

22.     Facebook has over 2.9 billion active monthly users.[1] Facebook's Community Standards require users to use their real identities when signing up on the platform; meaning users are only allowed one account and must use the name they use in "everyday life,"[2] including first and last name.[3] Users must also provide their birthday and gender.[4]

---

[1] *See* https://www.reuters.com/technology/facebook-owner-meta-forecasts-q1-revenue-below-estimates-2022-02-02/.
[2] *See* https://transparency.fb.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards%2Fintegrity_authenticity.
[3] Facebook.com Sign Up.
[4] *Id*.

23.     When a person signs up for Facebook, Facebook assigns them a unique Facebook ID number. The Facebook ID number is a digital address that allows any ordinary person to identify the Facebook user. For example, you can Google search the word "Facebook" and a given Facebook ID number, and the Facebook user's profile will return in the search. Even more straightforward, a person can go directly to a user's Facebook profile by appending the Facebook ID to the end of "facebook.com" and typing it into the address bar of any internet browser.

24.     When a user logs into Facebook using an internet browser, such as Google Chrome or Microsoft Edge, Facebook places several cookies on the user's browser.

25.     A "cookie" is a piece of code placed on a browser by a server that receives information stored by the cookie. A cookie can store different types of information, but the basic function is to identify a) the user and b) the website the user visited that placed the cookie to begin with.

26.     One of the cookies placed by Facebook on a user's browser upon login is the "c_user" cookie which contains the user's Facebook ID number. This cookie remains on a user's browser as long as they do not hit "Log Out" when they leave Facebook. Even if the user never visits Facebook.com using that browser again, the cookie will remain on the device for one year since the user's last visit to Facebook.

27.     The long life of the c_user cookie is intentional—not only does the cookie allow Facebook to identify users when they visit Facebook.com, it also allows Facebook to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person, unlike an IP address for example, Facebook can match up a user's activity across devices using different browsers.  This enables Facebook to know, for example, that a single user is accessing the internet from a cell phone, a laptop, and a tablet. Facebook can compile a comprehensive user profile across devices and see which websites were visited on each device.[5]

---

[5] *See* https://www.facebook.com/business/news/cross-device-measurement.

28.    By tracking a specific user's movements across the web and across devices, all enabled by the Facebook ID, Facebook collects enormous amounts of data regarding a user's interests, behavior, and connections.[6] The quantity and quality of this data allows Facebook to generate billions in advertising revenue—allowing businesses to target users with specific interests, target advertisements to specific users who visited their site but did not complete a purchase, and to analyze the types of Facebook users that are visiting their site by leveraging user demographics, interests, and behaviors on other websites.

29.    Businesses, including AMC, access these services from Facebook in part by installing the Facebook "pixel" on their website.

30.    Pixels, also known as "web beacons," are often small transparent images that an internet browser downloads like any other image on a website. When a user visits a web page which contains the Facebook pixel, the pixel is programmed to contact the Facebook ad server.

31.    The business installing the pixel can program the pixel to contact Facebook when users engage in specific conduct on the business's website, such as when a user places an item in their shopping cart, makes a purchase of an item or a service, clicks a certain button, or otherwise interacts with the website.[7] When the user has an active c_user cookie on their browser, and when the pixel is programmed to convey information about specific conduct (referred to as "events"), Facebook receives the event information along with the user's Facebook ID, thus connecting the specific Facebook user ID with the event-related information sent by the website.

32.    If a business does not install the pixel, information about the user's actions on the website is not communicated to Facebook.

33.    AMC and other businesses using Facebook services know that Facebook can identify the Facebook users visiting their websites. The value for the business in programming their website with the Facebook pixel is derived from Facebook's ability to identify the website visitors and link them to Facebook data on their interests, behaviors, and connections, and to allow

---

[6] *See* https://www.facebook.com/business/ads/ad-targeting.
[7] *See* https://developers.facebook.com/docs/meta-pixel/advanced.

the business to target or retarget advertisements to specific users. This enables businesses to, for example, target users who have purchased one product with advertisements for similar products, or companion products. One of the primary purposes for businesses who install the Facebook pixel is to enable the business to engage in remarketing campaigns where users who have engaged in specific behaviors on their website can be targeted with advertisements designed to encourage a subsequent behavior. For example, a consumer who placed an item in their "cart" might be targeted with remarketing ads for that item until the user completes the purchasing process.

34.     A Facebook user may, in some circumstances, be able to confirm that a website has shared information about their visit to a website with Facebook via the Facebook pixel on a certain date by reviewing their "Off-Facebook Activity" Report. An Off-Facebook Activity Report is something Facebook allows its users to view about themselves, and it constitutes "a summary of activity that businesses and organizations share with [Facebook] about [a user's] interactions, such as visiting their apps or websites."[8]

35.     At an unknown date, but at least by August 2021, AMC installed the Facebook pixel on its website and on the booking page for movie ticket purchases on the AMC Website.

36.     AMC programmed the Facebook pixel to collect and transmit to Facebook certain information about the online conduct of consumers on its website.

37.     AMC programmed the Facebook pixel to collect and transmit to Facebook the name of the movie that the consumer is purchasing a ticket for.

38.     AMC also programmed the Facebook pixel to collect and transmit to Facebook the name and location of the theater where the consumer will watch the movie.

39.     AMC programmed its website to send this information to Facebook along with the consumer's unique Facebook ID contained in the c_user cookie. The event information and the Facebook ID are sent at the same time.

---

[8] *See* https://www.facebook.com/help/2207256696182627/?helpref=search&query=off
%20facebook%20activity&search_session_id=b63aa858d36c0b7fe7a6e371e156de50&sr=1

40.     For example, the webpage to book tickets to see the movie "Indiana Jones and the Dial of Destiny" at the AMC Mission Valley 20 theater in San Diego, California, is shown below.



After selecting the theater, movie, date and time, and seats, customers are directed to the above page where they select the number and type of tickets to be purchased. Once the selections are made, the customer hits "continue" and can complete the online purchase of the ticket(s) for the selected movie.

41.     When a logged-in Facebook user visits the above webpage, the following information, *inter alia*, is contemporaneously sent to Facebook (red boxes added):

42.     The transmission for Facebook shown above is caused by the code installed by AMC on the AMC Website.

43.     As shown above, the transmission contains the name of the movie the consumer is purchasing a ticket for, the c-user cookie which contains the FID, and the fact that the consumer is checking out, to be sent to Facebook.

44.     Under the VPPA, "personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

45.     The Facebook ID, in this context, constitutes PII under the VPPA. *See Lebakken v. WEBMD, LLC*, No. 1:22-cv-644-TWT, 2022 WL 16716151, at *4 (N.D. Ga. Nov. 4, 2022) (finding alleged disclosure of plaintiff's "Facebook ID and email address in connection with her video viewing information to Facebook," "constituted a disclosure of PII, supporting a plausible claim under the VPPA" and denying motion to dismiss); *Stark v. Patreon, Inc.,* No. 22-cv-03131-JCS, 2022 WL 7652166, at *7-8 (N.D. Cal. Oct. 13, 2022) (holding Facebook ID qualified as PII under the VPPA under Ninth Circuit precedent and granting motion to dismiss on other grounds not applicable here).

46.     As shown above, the information AMC knowingly chooses to provide to Facebook, in a single transmission, permits an ordinary person to identify a consumer as having requested or obtained specific video materials or services from a video tape service provider.

47.     AMC has programmed its website to take advantage of the fact that Facebook knows who its users are as they browse the web. AMC informs Facebook which movies a Facebook user has purchased tickets for while knowing that the information is linked to a specific consumer and that the information provided is sufficient to "identify a person as having requested or obtained specific video materials or services from a video tape service provider."

48.     By systematically sending this information to Facebook, AMC violates consumers' right to privacy in their video-viewing history and their interests in retaining control over their personal information.

### III.    AMC SHARED INFORMATION WITH FACEBOOK REGARDING THE NAME OF THE MOVIE PLAINTIFF BRETTO PURCHASED TICKETS FOR ON AMC'S WEBSITE

49.     Plaintiff Bretto has had a Facebook account since at least 2013.

50.     Plaintiff Bretto accessed the AMC Website and purchased a movie ticket on May 3, 2022.

51.     Plaintiff Bretto was logged into her Facebook account on the same device used to access the AMC Website.

52.     When Plaintiff Bretto purchased movie tickets on the AMC Website on May 3, 2022, AMC shared the name of the movie Plaintiff purchased a ticket for with Facebook, along with her Facebook ID.

53.     Plaintiff Bretto's Off-Facebook Activity Report confirms that AMC shared information about her activity on the AMC Website on May 3, 2022.

54.     At all times relevant, Plaintiff Bretto never consented, agreed, or otherwise permitted Defendant to disclose her PII while purchasing movie tickets on the AMC Website.

55.     AMC knowingly disclosed Plaintiff Bretto's PII to Facebook when she purchased a movie ticket on the AMC Website.

56.     By disclosing this information to Facebook, AMC violated Plaintiff Bretto's right to privacy in her video-viewing history and her interest in retaining control over her personal information.

57.     Plaintiff Bretto has not purchased movie tickets on the AMC Website since learning of AMC's conduct. Plaintiff still desires to use this service and would purchase movie tickets on the AMC Website again if she knew that AMC would not share her video viewing information with third parties.

## IV.   AMC SHARED INFORMATION WITH FACEBOOK REGARDING THE NAME OF THE MOVIE PLAINTIFF KOPINSKY PURCHASED TICKETS FOR ON AMC'S WEBSITE

58.     Plaintiff Kopinsky has had a Facebook account since at least 2012.

59.     Plaintiff Kopinsky accessed the AMC Website and purchased a movie ticket on January 12, 2023.

60.     Plaintiff Kopinsky was logged into her Facebook account on the same device used to access the AMC Website.

61.     When Plaintiff Kopinsky purchased movie tickets on the AMC Website on January 12, 2023, AMC shared the name of the movie Plaintiff purchased a ticket for with Facebook, along with her Facebook ID.

62.     Plaintiff Kopinsky's Off-Facebook Activity Report confirms that AMC shared information about her activity on the AMC Website on January 12, 2023.

63.     At all times relevant, Plaintiff Kopinsky never consented, agreed, or otherwise permitted Defendant to disclose her PII while purchasing movie tickets on the AMC Website.

64.     AMC knowingly disclosed Plaintiff Kopinsky's PII to Facebook when she purchased a movie ticket on the AMC Website.

65.     By disclosing this information to Facebook, AMC violated Plaintiff Kopinsky's right to privacy in her video-viewing history and her interest in retaining control over her personal information.

66.     Plaintiff Kopinsky has not purchased movie tickets on the AMC Website since learning of AMC's conduct. Plaintiff still desires to use this service and would purchase movie tickets on the AMC Website again if she knew that AMC would not share her video viewing information with third parties.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring claims on behalf of themselves, individually, and on behalf of a class of all Facebook users in the United States who purchased movie tickets on the AMC Website where, within the statute of limitations, AMC disclosed to Facebook the name of the movie the user purchased tickets for (the "Class").

68.     Numerosity: Members of the Class are so numerous that joinder of all Class members is impracticable. Given the volume of Defendant's business, there are thousands of Class members.

69.     Commonality: This case presents common questions of law and fact, including but not limited to:

      a.     Whether AMC is a "video tape service provider" under the VPPA;

      b.     Whether AMC knowingly installed the Facebook pixel on its website and programmed it to collect information, including the movie title when consumers purchased tickets;

      c.     Whether AMC disclosed Class members' PII; and

      d.     Whether the transmissions at issue permit an ordinary person to identify a person as having requested or obtained specific video materials or services from a video tape service provider.

70.     Typicality: Plaintiffs' claims are typical of the members of the Class. Plaintiffs and all members of the Class visited the same website, programmed in the same way by AMC, and had the same information sent to Facebook.

71.     Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs and their experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

72.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the VPPA. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

73.     Class certification is also appropriate for equitable or injunctive relief because Defendant has acted or refused to act on grounds that apply generally to the Class such that final injunctive relief is appropriate respecting the Class as a whole.

74.     In view of the complexities of the issues and the expenses of litigation, the separate claims of individual Class members are insufficient in amount to support separate actions.

75.     Yet, the amount which may be recovered by individual Class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

## COUNT I

## VIOLATION OF THE VPPA,

## 18 U.S.C. § 2710, *et seq*.

76.     Plaintiffs reiterate each of the allegations in the preceding paragraphs as if set forth at length herein.

77.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

78.     Defendant is a "video tape service provider" because it sells movie tickets to consumers on the AMC Website and delivers pre-recorded movies to consumers in movie theaters, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

79.     Plaintiffs and the Class are "consumers" because they purchased movie tickets on the AMC Website. 18 U.S.C. § 2710(a)(1).

80.     Defendant disclosed to Facebook the PII of Plaintiffs and members of the Class. Defendant transmitted the Class members' Facebook ID and the name of the movie they were purchasing tickets for, in a single transmission, to Facebook. This information sufficiently permits an ordinary person to identify a specific individual's video viewing behavior.

81.     Defendant transmitted this PII knowingly. It installed the Facebook pixel on its website, including the movie ticket booking page, and determined which information it wanted to share with Facebook. Defendant knew Facebook would identify a substantial number of the consumers who visited the AMC Website and transmitted the information regarding which movies consumers purchased tickets for anyway.

82.     Plaintiffs and members of the Class did not consent to allow Defendant to disclose their PII to third parties.

83.     On behalf of themselves and the Class, Plaintiffs seek, pursuant to 18 U.S.C. § 2710(c): (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the

interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA; (iv) punitive damages; and (v) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

A.    Determining that this action may proceed as a class action;

B.    Designating Plaintiffs as the class representatives for the Class;

C.    Designating Plaintiffs' counsel as counsel for the Class;

D.    Issuing proper notice to the Class at Defendant's expense;

E.    Declaring that Defendant violated the VPPA;

F.    Awarding actual and/or statutory damages as provided by the VPPA;

G.    Awarding punitive damages;

H.    Granting appropriate injunctive relief;

I.    Awarding reasonable attorneys' fees and costs and expenses; and

J.    Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues triable by a jury.

Dated: July 19, 2023                          Respectfully submitted,


                                                _/s/ Paul D. Sinclair_____
                                               Paul D. Sinclair (KS Bar No. 22799)
                                               COWING & MENDELSON, P.C.
                                               3300 N.E. Ralph Powell Road
                                               Lee's Summit, MO 64064
                                               Tel.:  816-373-8881
                                               paulsinclair219@gmail.com

                                               Sherrie R. Savett*
                                               Lane L. Vines*
                                               BERGER MONTAGUE PC
                                               1818 Market Street, Suite 3600
                                               Philadelphia, PA 19103
                                               Tel.: (215) 875-3000
                                               ssavett@bm.net
                                               lvines@bm.net

                                               Sophia M. Rios*
                                               BERGER MONTAGUE PC
                                               401 B Street, Suite 2000
                                               San Diego, CA 92101
                                               Tel.: (619) 489-0300
                                               srios@bm.net

                                               * *Pro hac vice* motion to be filed

                                               *Attorneys for Plaintiffs*
                                               *and the proposed Class*