# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JASMINE BRETTO and NAOMI
KOPINSKY, individually and on behalf of
those similarly situated,

       **Plaintiffs**,

v.

AMC ENTERTAINMENT HOLDINGS,
INC.,

       **Defendant**.

     **Case No. 23-2317-DDC-ADM**

## MEMORANDUM AND ORDER

Plaintiffs Jasmine Bretto and Naomi Kopinsky, individually and on behalf of those similarly situated, brought this proposed class action lawsuit against defendant AMC Entertainment Holdings, Inc.  Plaintiffs allege that after they purchased movie tickets from its website, AMC violated the Video Protection Privacy Act (VPPA) by sharing statutorily protected information with Facebook.  AMC then filed a Combined Motion to Compel Arbitration, or in the Alternative, to Dismiss for Failure to State a Claim.  AMC contends plaintiffs agreed to arbitrate their claim when they purchased movie tickets.  Alternatively, AMC argues that plaintiffs can't state a claim for relief under the VPPA.  Plaintiffs responded, opposing AMC's Combined Motion.  Doc. 26.  AMC replied, addressing only the arbitration portion of its Combined Motion.  Doc. 28.

Before its reply was due—in an attempt to preserve interlocutory appeal rights under the Federal Arbitration Act—AMC requested that the court stay briefing on the Motion to Dismiss

portion of its Combined Motion.  Doc. 27.  Or, alternatively, AMC requested leave to withdraw its Motion to Dismiss without prejudice to refiling.  *Id.*  Plaintiffs responded, opposing AMC's request.  Doc. 29.  AMC replied.  Doc. 30.  The court now is ready to rule on these motions.

The court finds plaintiffs didn't enter a binding agreement to arbitrate their claim and thus denies AMC's Motion to Compel Arbitration (Doc. 21).  The court also denies AMC's request to stay briefing on its Motion to Dismiss.  Doc. 27.  But the court grants AMC's request to withdraw its Motion to Dismiss without prejudice to refiling.  *Id.*  The court thus denies AMC's Motion to Dismiss as moot.  The court explains these decisions, below.

## I.      Background

The court briefly recites the facts relevant to these motions.

AMC is one of the largest movie theater operators in the world.  Doc. 1 at 1 (Compl. ¶ 2). Plaintiffs allege that they purchased movie tickets from AMC's website and AMC then unlawfully shared information about those transactions with Facebook.  *Id.* at 11–12 (Compl. ¶¶ 49–56, 58–65).  Plaintiffs argue this information sharing violated the VPPA.  *Id.* at 15 (Compl. ¶¶ 76–82).  They brought this federal question action and seek class certification and legal and equitable relief.  *Id.* at 15–16 (Compl. ¶ 83, Prayer for Relief).

AMC, for its part, contends that plaintiffs—by purchasing tickets through AMC's website—agreed to arbitrate their claim.  Doc. 22 at 11–20.  Plaintiffs respond, asserting they never assented to arbitration.  Doc. 26 at 12–17.  At bottom, then, the court must resolve whether plaintiffs—by purchasing movie tickets through AMC's website—assented to AMC's terms and conditions, including a binding arbitration provision.  The parties submitted screenshots of AMC's website.  Doc. 22 at 12; Doc. 24 at 4; Doc. 26-2 at 2–10.  Based on these screenshots, the court briefly summarizes the layout of the relevant webpage:  AMC's ticket checkout screen.

The "Purchase" button appears prominently at the bottom right of the screen.  It is attached to a frozen—or stickied—panel at the bottom of the page.  No matter where the consumer scrolls, this panel remains visible at the bottom of the screen.  Next to the purchase button is a warning.  Though it's somewhat difficult to read in hard copy format, this warning provides, "*You must complete all required fields*[.]"  And next to that warning is the price.  Before the consumer inputs an email address and payment method, the "Purchase" button is unavailable, appearing only in gray.  After the consumer inputs an email address and payment method, the warning—"*You must complete all required fields*"—disappears, and the "Purchase" button lights up and becomes available to activate.



Doc. 26-2 at 2.

On the left side of the webpage—detached from the frozen panel—is a field for the user to enter an email address.  Below that field is an area that reads "Payment Method[,]" which lists several different payment options including BitPay, Google Pay, PayPal, Venmo, and the option

to add a card.  Under that field is another field providing the consumer with the option to pay

with gift cards.  Then, below that option, is a field for a "Ticket Voucher[.]"  Finally, at the

bottom left of the webpage—underneath all the payment options—come two textual warnings.

The first says, "Sorry no refunds provided after the displayed showtimes."  The second one

warns, "By selecting Purchase, I agree to the AMC Terms and Conditions."  The text "AMC

Terms and Conditions" provides a blue hyperlink to the referenced terms.  Doc. 22 at 12.



Doc. 26-2 at 3.



AMC's
Terms and
Conditions 

Doc. 26-2 at 5.[1]

Appendix A—at the end of this Order—includes the full library of screenshots on which this textual description is based. Consulting these screenshots provides the factual context for the court's textual description.

## II.      Motion to Compel Arbitration

### A.      Legal Standard

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, requires that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable[.]"  9 U.S.C. § 2.  Section 3 of the FAA permits the court to stay litigation in favor of arbitration.  *Id.* § 3.  The United States Supreme Court interprets the FAA to establish a

---

[1]      The plaintiffs' screenshots show a field below "Ticket Voucher" for "Disney Rewards[.]"  *See* Doc. 26-2 at 4–5, 9–10.  That field isn't visible in AMC's screenshot.  *See* Doc. 22 at 12.  But this discrepancy doesn't affect the court's conclusion.

strong federal policy favoring arbitration and thus requiring "liberal reading of arbitration agreements[.]"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 n.27 (1983).  But the Supreme Court recently clarified, the "federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022); *see also id.* (explaining that the policy "'is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts'" (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010))).

When an agreement contains an arbitration clause, "a presumption of arbitrability arises[.]"  *ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).  But, the key word in this sentence is "agreement."  That's so "because 'arbitration is a matter of contract' and the authority of an arbitrator arises only from the parties['] agreement to that forum in advance[.]"  *Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146 (10th Cir. 2014) (quoting *AT & T Techs.*, 475 U.S. at 648–49).  So, "'a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit.'"  *Id.* (brackets omitted) (quoting *AT & T Techs.*, 475 U.S. at 648–49); *see also Dodson Int'l Parts, Inc. v. Williams Int'l Co.*, 12 F.4th 1212, 1219–20 (10th Cir. 2021) (explaining that "the presumption is not a license to override the parties' expressed intent" and so, courts "must not undermine 'the first principle that underscores all the Supreme Court's arbitration decisions:  Arbitration is strictly a matter of consent'" (brackets omitted) (quoting *Granite Rock*, 561 U.S. at 299)).

The presumption of arbitrability thus "falls away" when the parties dispute whether they have entered a valid and enforceable arbitration agreement with one another.  *See Riley Mfg. Co.*

*v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998).  A court may compel

arbitration "only when satisfied that the making of the agreement to arbitrate is not at issue."

*Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (quotation

cleaned up).  The court now applies these governing principles to this case.

### B.    Analysis

The court denies AMC's Motion to Compel Arbitration.  The court reaches this result

based on one simple conclusion:  Plaintiffs didn't assent to a binding agreement to arbitrate.

Kansas law governs whether a contract existed between the plaintiffs and AMC.[2]  Kansas

follows ordinary principles of contract formation.  "A binding contract typically entails an offer

of terms, an acceptance of those terms, and consideration or a thing of value passing from each

party to the other."  *Duling v. Mid Am. Credit Union*, 530 P.3d 737, 744 (Kan. Ct. App. 2022)

(citing *M West, Inc. v. Oak Park Mall*, 234 P.3d 833, 844 (Kan. Ct. App. 2010)); *see also*

---

[2]     AMC contends that Kansas law governs whether a contract to arbitrate exists between the parties.
Doc. 22 at 16–17.  Plaintiffs don't challenge this proposition.  *See generally* Doc. 26.  The choice of law
inquiry "is not so straightforward" when a federal court exercises federal question jurisdiction but must
resolve state law issues that are merely incidental to the federal claim.  *Berman v. Freedom Fin. Network,
LLC*, 30 F.4th 849, 862 (9th Cir. 2022) (Baker, J., concurring).  The Ninth Circuit has concluded district
courts should apply the choice of law rules of the forum state.  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987,
994 (9th Cir. 2010).  And although our Circuit hasn't said so expressly, it too has "assumed that state
choice of law rules apply to decide which state's substantive law governs arbitration contracts."  *Graddy
v. Carnegie Acad., LLC*, No. 22-CV-00222-DBB-CMR, 2024 WL 642524, at *7 n.79 (D. Utah Feb. 15,
2024) (citing *Howard v. Ferrellgas Partners, LP*, 748 F.3d 975, 982 (10th Cir. 2014)).  So, the court
applies Kansas choice of law rules.

"Kansas choice of law principles suggest that the location of 'the last act necessary' to form the
contract determines which state law governs contract formation dispute."  *Howard*, 748 F.3d at 982 (first
citing *In re K.M.H.*, 169 P.3d 1025, 1031–32 (Kan. 2007); and then citing Restatement (First) of Conflict
of Laws § 332 (1934)).  The named plaintiffs here are citizens of Massachusetts and Louisiana.  Doc. 1 at
2 (Compl.  ¶¶ 8, 9).  So, it's possible that the named plaintiffs purchased their movie tickets in their home
states.  In that case, Massachusetts and Louisiana might govern.  But the plaintiffs haven't alleged such
facts.  And if "a party fails to make 'a clear showing that another state's law should apply,' Kansas choice
of law principles require a court to default to Kansas substantive law."  *Howard*, 748 F.3d at 982 (quoting
*In re K.M.H*, 169 P.3d at 1032).  The court thus applies Kansas law to determine whether the parties
agreed to arbitrate.

*Wakeman v. Uber Techs., Inc.*, No. 23-cv-02092-TC-TJJ, 2024 WL 836985, at *3 (D. Kan. Feb. 28, 2024) ("Kansas law requires an offer, an acceptance, and an exchange of legal consideration between parties with capacity to enter a contract in order for a contract to be formed.").  "The parties must each accept the essential terms of the contract and outwardly communicate that acceptance in a way reasonably intended to be understood as such."  *Duling*, 530 P.3d at 744 (first citing *Sw. & Assocs. Inc. v. Steven Enters., LLC*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004); and then citing *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008)).[3]

As far as the court could discern, Kansas courts have had no occasion to analyze contracts arising from online interactions.  But instruction from other courts guides the analysis here.  "[E]lemental principles of contract formation apply with equal force to contracts formed online.  Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed."  *Berman*, 30 F.4th at 855–56 (applying New York and California law).

Historically, courts have categorized online agreements as either "clickwrap" or "browsewrap."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *Eakins v. Whaleco Inc.*, No. CIV-23-560-J, 2024 WL 1190766, at *2 (W.D. Okla. Mar. 5, 2024), *appeal docketed*, No 24-6048 (10th Cir. July 8, 2024) (citations omitted) ("Broadly speaking, there are two types of online agreements:  'clickwraps' and 'browsewraps.'").  Clickwrap agreements "require users

---

[3]     Ordinarily, the existence of a contract is a question of fact under Kansas law.  *Sw. & Assocs.*, 88 P.3d at 1249 (citing *Reimer v. Waldinger Corp.*, 959 P.2d 914, 916 (Kan. 1998)).  But "traditional contract principles" dictate that "where there is no dispute as to the material facts, the existence of a contract is a question of law for the court to decide."  *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 13–14 (Cal. Ct. App. 2021) (quotation cleaned up).  Likewise, the Supreme Court has instructed that it is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide."  *Granite Rock*, 561 U.S. at 296.  And neither party here disputes that the other submitted genuine screenshots of AMC's website.  So, the court decides the issue whether the parties contracted to arbitrate plaintiffs' claim by referring to the undisputed facts, as contained in those screenshots.

to click an 'I agree' box after being presented with a list of terms and conditions of use[.]"
*Meyer*, 868 F.3d at 75; *Berman*, 30 F.4th at 856.  Because clickwrap agreements require express

assent, courts generally find them enforceable.  *Berman*, 30 F.4th at 856.  Browsewrap

agreements, in contrast, "do not require the user to expressly assent."  *Meyer*, 868 F.3d at 75.

Instead, they "post terms and conditions on a website via a hyperlink at the bottom of the

screen."  *Id.*  "Courts have consistently held this type of agreement to be unenforceable, as

individuals do not have inquiry notice."  *Keebaugh v. Warner Bros. Ent., Inc.*, 100 F.4th 1005,

1014 (9th Cir. 2024).

But the clickwrap and browsewrap categories don't encompass every circumstance.

"[T]here are infinite ways to design a website . . . and not all interfaces fit neatly into the

clickwrap or browsewrap categories."  *Meyer*, 868 F.3d at 75.  Here, for example, AMC's

website doesn't fit squarely into either of these categories.  It isn't clickwrap because AMC's

users aren't required to assent affirmatively to the terms before purchasing movie tickets.  *See*

*Sellers*, 289 Cal. Rptr. 3d at 15.  And it isn't browsewrap because the AMC website ostensibly

provides notice to consumers that by clicking the "Purchase" button, they also assent to the terms

and conditions.  *See id.*  Instead, courts refer to this kind of agreement as "sign-in wrap."  *See,*

*e.g.*, *id.*; *Keebaugh*, 100 F.4th at 1014; *Eakins*, 2024 WL 1190766, at *3.  As the California

Court of Appeals explained:

> Sign-in-wrap agreements are those in which a user signs up to use an internet
> product or service, and the sign-up screen states that acceptance of a separate
> agreement is required before the user can access the service.  While a link to the
> separate agreement is provided, users are not required to indicate that they have
> read the agreement's terms before signing up.  Instead, the website is designed so
> that a user is notified of the existence and applicability of the site's "terms of use"
> usually by a textual notice when proceeding through the website's sign-in or login
> process.

*Sellers*, 289 Cal. Rptr. 3d at 15 (quotation cleaned up).

Where a consumer doesn't have actual awareness of an agreement, a website operator must give "reasonably conspicuous notice of the terms to which the consumer will be bound[.]" *Berman*, 30 F.4th at 856; *see also Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 835 (2d Cir. 2021) ("[R]egardless of the precise nature of a web-based contract, the ultimate question concerning inquiry notice on a motion to compel arbitration . . . [is] whether the notice of arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." (quotation cleaned up)). Courts analyze mutual assent in these circumstances "under an objective-reasonableness standard." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023). This inquiry—whether a website has provided reasonably conspicuous notice of its terms—is fact-intensive. *Id.* at 513–14; *Meyer*, 868 F.3d at 76. To aid this analysis, courts have identified several relevant factors. They include:

> (1) the size of the text; (2) the color of the text compared to the background; (3) the location of the text and its proximity to where the user clicks to consent; (4) the obviousness of an associated hyperlink; and (5) other elements on the screen which clutter or obscure the textual notice.

*In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (citing *Sellers*, 289 Cal. Rptr. 3d at 23).[4] The court finds these factors useful in determining whether plaintiffs contracted with AMC to arbitrate their claims.[5]

---

[4]     The factors articulated here come from courts applying California law. But courts applying the law in other jurisdictions have applied similar factors when analyzing internet-based contracts. *See, e.g.*, *Route App, Inc. v. Heuberger*, No. 22-CV-291-TS-JCB, 2022 WL 2316377, at *4 (D. Utah June 28, 2022) (applying Delaware law and finding sign-in wrap agreement enforceable where webpage was uncluttered, text of notice was clear, and notice was close to the "Continue" button); *Eakins*, 2024 WL 1190766, at *3–4 (applying New York and Oklahoma law and finding sign-in wrap agreement unenforceable where terms were "spatially decoupled" from the "continue" button and not visually distinguishable from surrounding text); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (applying New York and Utah law and finding sign-in wrap agreement unenforceable because terms weren't visible without scrolling to bottom of page), *aff'd*, 380 F. App'x 22 (2d Cir. 2010). So, the court concludes that these factors are useful in assessing the fundamental contract principles that also apply under Kansas law.

[5]     Given the many relevant factors and fact-intensive nature of the inquiry, it isn't surprising that courts routinely disagree whether sign-in wrap agreements are enforceable. *Compare, Eakins*, 2024 WL

Applying these factors, the court holds that plaintiffs didn't agree to arbitrate their claim. As a threshold matter, plaintiffs maintain that they weren't actually aware of AMC's terms and conditions.  Doc. 26-3 at 1 (Bretto Decl. ¶ 4); Doc. 26-4 at 1 (Kopinsky Decl. ¶ 4).  AMC doesn't contest this assertion.[6]  *See generally* Doc. 28.  So, the agreement to arbitrate binds plaintiffs only if AMC establishes that its website gives a consumer reasonably conspicuous notice of its terms.  *See Berman*, 30 F.4th at 856.  AMC hasn't shouldered that burden.  AMC's notice of terms wasn't sufficiently conspicuous.  This is so because (1) a consumer could complete a purchase without ever seeing the notice of AMC's terms and conditions and (2) AMC's terms and conditions were "spatially decoupled" from the "Purchase" button.

*First*, an AMC consumer could purchase movie tickets without *ever* seeing AMC's warning about its terms and conditions.  This is evident in the screenshots plaintiffs submitted in response to AMC's arbitration motion.  Doc. 26-2 at 2–10.  The notice of AMC's terms and conditions appears at the bottom of the screen, under the payment method section of the webpage.

---

1190766, at *3–4 (finding sign-in wrap agreement unenforceable because notice wasn't clearly a hyperlink and because agreement was "spatially decoupled from the attention grabbing orange 'Continue' button"), *and Lawrence v. Finicity Corp.*, No. 23-cv-01005-DJC-AC, 2024 WL 584615, at *18–21 (E.D. Cal. Feb. 13, 2024) (finding sign-in wrap agreement unenforceable because website layout "deemphasized" terms and conditions and because context of transaction wouldn't suggest that consumer was entering a "forward-looking relationship with the defendant" (quotation cleaned up)), *with Meyer*, 868 F.3d at 77–80 (finding sign-in wrap agreement enforceable where payment screen was uncluttered, entire screen was visible at once, and terms and conditions were delineated clearly), *and Keebaugh*, 100 F.4th at 1019–21 (finding sign-in wrap agreement enforceable where users contemplated an ongoing relationship with application, notice of terms was adjacent to where user needed to click, and notice of terms was visually clear).  As one judge explained, website operators who try to bind consumers with sign-in wrap agreements "tempt fate."  *See Berman*, 30 F.4th at 861 (Baker, J., concurring).

[6]     Even if AMC had contested that plaintiffs had actual notice of its terms, the court, at this stage, must give plaintiffs "the benefit of all reasonable doubts and inferences that may arise."  *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (quotation cleaned up).



AMC's
Terms and
Conditions

Doc. 26-2 at 5; Doc. 22 at 12.  When a consumer first enters the page to purchase a ticket, the

large "Purchase" option is grayed out and unavailable.



Empty
Email
Field

No Payment
Method
Selected

Warning that
says, "You
must complete
all required
fields"

Unavailable
"Purchase"
Button

Doc. 26-2 at 2; Doc. 22 at 5.  But when the consumer inputs a payment method and email

address, the "Purchase" button lights up; that is, it's no longer grayed out and becomes available

for the consumer to activate.  Doc. 26-2 at 3–5, 8–10.  And the warning—"*You must complete all*

*required fields"*—disappears.



Doc. 26-2 at 2–4.  Importantly, consumers can select a payment method without scrolling to the bottom of the page.  *Id.*  So, a consumer could select a payment method and complete a purchase without AMC's notice of terms and conditions ever appearing on the consumer's screen.

Courts routinely cite visibility of terms—without the need to scroll—as an important factor for determining whether those terms are sufficiently conspicuous.  *See, e.g.*, *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) (citations omitted) (explaining that "courts decline to enforce agreements where the terms are available only if users scroll to a different screen");  *Heuberger*, 2022 WL 2316377, at *4 (D. Utah June 28, 2022) ("The entire page appears on a single screen and does not require the user to scroll beyond what is already visible to see the Terms of Service.");  *Small Justice LLC v. Xcentric Ventures LLC*, 99 F. Supp. 3d 190, 197 (D. Mass. 2015) ("That screen, along with at least two of the other screens used in the posting process, also contained blue links to the terms of service at the bottom of the page which were conspicuously visible without scrolling beyond the 'continue' button used to progress to the

subsequent screen.").  And for good reason:  Contract terms shouldn't bind consumers who had no reason to know those contract terms existed.

AMC's responsive arguments don't persuade the court.  AMC argues that its terms are "*directly below* the Payment Method section."  Doc. 28 at 5 (emphasis in original).  That's true.  But it doesn't change the proposition that a consumer can select a payment method without ever scrolling and seeing the terms and conditions notice.  And the terms aren't included after the typical payment methods that a consumer would use—credit card, PayPal, Venmo, and so on.  Instead, AMC placed them below two more fields for "Gift Cards" and "Ticket Voucher[s.]"  *See* Doc. 22 at 12.  AMC's own screenshot reveals that a consumer—after inputting an email address and credit card information—would need to scroll for another half page to find the notice of terms and conditions.



*See id.*

AMC next argues that "common sense" suggests consumers would scroll to the end of the page to ensure that they had completed all fields.  Doc. 28 at 6.  Not so.  AMC's website

design notifies reasonable consumers that they have completed all required fields when the

"Purchase" button transitions from grayed out and unavailable to lit and available.  Putting it

another way, when the "Purchase" button lights up, a consumer has no reason to continue

scrolling.  This especially is true once AMC's textual warning about completing all fields

disappears from the screen.  AMC's website signals to consumers that they have no more

required tasks after filling in an email address and selecting a payment method.  A reasonable

consumer would have no reason to continue scrolling at that point.  And "consumers cannot be

expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect

they will be bound."  *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).  By

employing a website design that allowed users to complete purchases without ever encountering

a notice of terms and conditions, AMC "ran the risk of a court concluding . . . that the notice was

not sufficiently conspicuous."  *See Berman*, 30 F.4th at 867 (Baker, J., concurring).

        *Second*, AMC's terms and conditions were "spatially decoupled" from the "Purchase"

button.  The red "Purchase" button appears at the bottom right of the page and remains in place

wherever the user scrolls; notice of AMC's terms and conditions hides in the bottom left of the

page and appears only if the user scrolls to the bottom of the webpage.



Terms and Conditions

Purchase Button

Doc. 22 at 12; *see also* Doc. 24 at 4; Doc. 26-2 at 5.  This spatial gap between the attention-grabbing object and the terms and conditions warning increases the risk that a reasonable consumer won't see the terms and conditions.  And courts regularly cite the distance between the attention-demanding button and the notice of terms as a relevant factor for determining the enforceability of those terms.  *See, e.g.*, *Eakins*, 2024 WL 1190766, at * 3 (compiling cases that have found spatial distances between "attention-grabbing" object and notice of terms and conditions important); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 294 (2d Cir. 2019) ("The 'Terms & Conditions' hyperlink was spatially decoupled from the transaction because it was not provided near the portion of the Amazon purchase page actually requiring [the consumer's] attention[.]"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236–37 (2d Cir. 2016) ("Nothing about the 'Place your order' button alone suggests that additional terms apply, and the presentation of terms is not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as acceptance."); *Snow v. Eventbrite, Inc.*, No. 20-cv-03698-

WHO, 2020 WL 6135990, at *8 (N.D. Cal. Oct. 19, 2020) (examining cases where sign-in wrap agreements have been upheld and observing that "the sign-in wrap agreement is adjacent to the buttons that signal acceptance").  So, even if a user scrolled to the bottom of AMC's website, the larger, brighter, and more important object—the "Purchase" button—diverts the user's attention away from the notice of terms and conditions, which rests on the opposite side of the webpage. *See* Doc. 26-2 at 5; *Eakins*, 2024 WL 1190766, at *3 (highlighting that "terms of use agreement appears in relatively small font . . . spatially decoupled from the attention-grabbing orange 'Continue' button").  This spatial relationship bolsters the court's conclusion that AMC didn't give sufficiently conspicuous notice of its terms.

To be sure, the text's color and the obviousness of the associated hyperlink support AMC's position.  The "AMC Terms and Conditions" appear in blue font, "the color typically used to signify the presence of a hyperlink."  *Berman*, 30 F.4th at 854.  And that blue font contrasts with the webpage's gray background.  So, these factors help AMC's cause.  But they aren't enough.  AMC designed a website that allowed consumers to purchase movie tickets without ever seeing its notice of terms and conditions.  What's more, even if a user scrolled to the bottom of AMC's website, the notice of terms and conditions is on the opposite side of the webpage as the large, attention-grabbing "Purchase" button.  Taken together, AMC hasn't proven that its notice of terms was sufficiently conspicuous to put plaintiffs on inquiry notice.  So, those terms don't bind plaintiffs to arbitrate their claim.  The court thus denies AMC's Motion to Compel Arbitration (Doc. 21).

## III.        Motion to Stay

After plaintiffs responded to AMC's Combined Motion to Compel Arbitration or, in the Alternative, to Dismiss for Failure to State a Claim, AMC filed a motion asking the court to stay briefing on the Motion to Dismiss portion of its Combined Motion.  Doc. 27.  Alternatively,

AMC requests leave to withdraw its Motion to Dismiss without prejudice to refiling.  *Id.* at 3.
AMC explains that it wishes to ensure that it has preserved its interlocutory appeal rights under
the FAA.  *Id.* at 1–3.  Plaintiffs oppose these requests.  Doc. 29.  The court denies AMC's
request to stay briefing.  Instead, the court grants AMC's alternative request and will allow it to
withdraw its Motion to Dismiss without prejudice to refiling.

Whether to allow AMC to withdraw its motion is within the court's discretion.  *See
United States v. Filson*, 347 F. App'x 987, 991 (5th Cir. 2009) ("Courts have consistently
allowed parties to refile or amend motions and supporting documents as a valid exercise of their
discretion in case management." (citations omitted)).  Generally, "there is no reason to deny the
amendment when the trial judge believes it would be in the interests of justice to permit it."  5 A.
Benjamin Spencer, Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §
1194 (4th ed. 2024); *see also Robinson v. Worthington*, 544 F. Supp. 956, 963–64 (M.D. Ala.
1982) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (suggesting that leave to amend and
withdraw motions should be freely given absent undue delay, bad faith or dilatory motive,
repeated failures to cure, futility, or undue prejudice to the opposing party); *Ortiz v. Minn. Life
Ins. Co.*, No. 20-CV-00923-SDJ-CAN, 2023 WL 3993047, at *1 (E.D. Tex. June 9, 2023)
(characterizing discretion to allow party to amend motion as "similar to the Court's discretion
whether to grant leave to amend pleadings under Rule 15").

Likewise, "[a] court has broad discretion in managing its docket, which includes
decisions regarding issuing stays for all or part of a proceeding."  *Howard v. City of
Albuquerque*, 349 F. Supp. 3d 1137, 1144 (D.N.M. 2018) (citing *Clinton v. Jones*, 520 U.S. 681,
706 (1997)).  But generally, a party seeking a stay faces a stiffer burden than a party seeking to
amend a motion.  *Compare Howard*, 349 F. Supp. 3d at 1144 ("The party seeking a stay

18

generally faces a difficult burden."), *with Robinson*, 544 F. Supp. at 963–64 (suggesting that

leave to amend a motion should be "freely given").  So, the court concludes that allowing AMC

to withdraw part of its motion is the best course.  Staying briefing on the current motion prevents

the court from resolving the present motion expeditiously.  *See* Fed. R. Civ. P. 1 (instructing

courts to employ Federal Rules of Civil Procedure to "secure the just, speedy, and inexpensive

determination of every action").  It also prevents the parties from responding to significant

developments in the law that have occurred since they submitted briefs on AMC's Motion to

Dismiss.  *See, e.g.*, *Garza v. Alamo Intermediate II Holdings, LLC*, No. 23-cv-05849-VC, 2024

WL 1171737 (N.D. Cal. 2024), *appeal docketed*, No. 24-2165 (9th Cir. Apr 8, 2024) (finding no

cause of action against movie theater under VPPA); *Walsh v. Cal. Cinema Invs. LLC*, No. 23-cv-

09608-ODW (AJRX), 2024 WL 3593569 (C.D. Cal. July 29, 2024) (same); *Christopherson v.

Cinema Ent. Corp.*, No. 23-cv-3614 (JWB/LIB), 2024 WL 1120925, at *4 (D. Minn. Mar. 6,

2024) (characterizing issue of VPPA claims against movie theaters as "unsettled" (citations

omitted)).

But allowing AMC to withdraw its Motion to Dismiss resolves these concerns.  AMC's

request doesn't appear to suffer from undue delay, bad faith or dilatory motive, repeated failures

to cure, undue prejudice to plaintiffs, or futility—the infirmities identified in *Robinson*.  544 F.

Supp. at 963–64.  Indeed, plaintiffs identify no prejudice that withdrawal would impose.[7]  And

---

[7]     Plaintiffs raise two arguments in their opposition to AMC's request.  *First*, they contend that
AMC's request is moot because briefing on AMC's Combined Motion is complete.  Doc. 29 at 1–2.  But
that isn't responsive to AMC's request to withdraw its motion, which isn't moot because the court hasn't
yet decided that question.  *Second*, plaintiffs argue that AMC's request is futile because it already has
forfeited its interlocutory appeal rights.  *Id.* at 2–3.  So, plaintiffs say, granting AMC relief on its motion
will unnecessarily delay this case.  Again, the court disagrees.  Should AMC appeal the court's decision
denying its request to compel arbitration, our Circuit can decide in the first instance whether it has
jurisdiction.  And AMC evidently would appeal this denial whether the court granted it relief on its
Motion to Stay or not.  *See* Doc. 27 at 2–3 (suggesting that the court's resolution of its motion won't

should AMC refile a motion to dismiss, plaintiffs will have the opportunity to respond to developments in the law that—at least facially—appear unfavorable to their cause of action. The overarching principle that the court freely should give leave to parties to amend their papers compels the court to grant AMC's request. *See id.* So, exercising its discretion, the court will allow AMC to withdraw its Motion to Dismiss without prejudice to refiling.

## IV.      Conclusion

In sum, the court denies AMC's request to compel arbitration. AMC's website didn't provide sufficient notice to bind plaintiffs. The court denies AMC's request to stay briefing on its Combined Motion. But it grants AMC's alternative request to withdraw the Motion to Dismiss portion of its Combined Motion without prejudice to refiling. The court thus denies the entirety of AMC's Combined Motion: It denies AMC's Motion to Compel Arbitration on the merits, and it denies AMC's Motion to Dismiss as moot.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant AMC Entertainment Inc.'s Combined Motion to Compel Arbitration, or in the Alternative, to Dismiss for Failure to State a Claim (Doc. 21) is denied.

**IT IS FURTHER ORDERED THAT** AMC's Motion to Stay Deadlines (Doc. 27) is denied. But the court grants AMC's alternative request to withdraw its Motion to Dismiss (Doc. 27) without prejudice to refiling.

**IT IS SO ORDERED.**

**Dated this 10th day of September, 2024, at Kansas City, Kansas.**

                              **s/ Daniel D. Crabtree**
                              **Daniel D. Crabtree**
                              **United States District Judge**

---

affect its appeal rights and that it's proceeding "out of an abundance of caution"). So, the court concludes, allowing AMC to withdraw its Motion to Dismiss won't delay the proceedings unnecessarily.

## V.        Appendix A



Doc. 26-2 at 2.



Doc. 26-2 at 3.



Doc. 26-2 at 4.



Doc. 26-2 at 5.



Doc. 26-2 at 6.



Doc. 26-2 at 7



Doc. 26-2 at 8.



Doc. 26-2 at 9.



Doc. 26-2 at 10.



Doc. 22 at 5; Doc. 24 at 4.