**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JASMINE BRETTO and NAOMI KOPINSKY, individually and on behalf of those similarly situated, | Case No. 2:23-cv-02317 |
| Plaintiffs, | Hon. Daniel D. Crabtree |
| v. | Magistrate Judge |
| AMC ENTERTAINMENT HOLDINGS, INC., | Hon. Angel D. Mitchell |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
AMC ENTERTAINMENT HOLDINGS, INC.'S RENEWED MOTION
<u>TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

**BERGER MONTAGUE PC**
Sherrie R. Savett (admitted *pro hac vice*)
Barbara A. Podell*
Lane L. Vines (admitted *pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
bpodell@bm.net
lvines@bm.net

Sophia M. Rios (admitted *pro hac vice*)
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bm.net

* *Pro hac vice* motion to be filed

**COWING & MENDELSON, P.C.**
Paul D. Sinclair (KS Bar No. 22799)
3300 N.E. Ralph Powell Road
Lee's Summit, MO 64064
Tel.: (816) 373-8881
Paulsinclair219@gmail.com

*Attorneys for Plaintiffs and the proposed Class*

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ ii

II.     RELEVANT FACTS ........................................................................................... 3

III.    ARGUMENT ....................................................................................................... 4

      A.      AMC Is a Video Tape Service Provider under the VPPA. ..................... 5

            1.   AMC Is a Provider under the Plain Language of the VPPA. ......................... 5

            2.   The Plain Text Does Not Require Home or Private Delivery ....................... 9

            3.   Applying the VPPA to Movie Theaters Is Consistent with the Legislative Purpose. ........................................................................................... 11

      B.      AMC Disclosed Personally Identifiable Information............................................ 13

IV.     CONCLUSION ................................................................................................... 15

**Exhibits:**

Ex. 1   *FAQ*, LANDMARK THEATRES, https://tinyurl.com/hut2w269

Ex. 2   *Technicolor and Bow Tie Cinemas Pact to Deploy Technicolor 3D*, BUSINESS WIRE (Mar. 2, 2010)

Ex. 3   *How are movies delivered on the cinema screens?*, GALALITE SCREENS, https://tinyurl.com/5kmwe2w8

Ex. 4   GQT MOVIES, https://tinyurl.com/mr57bxvr

Ex. 5   OAKS CENTER, https://tinyurl.com/4h968sfd

Ex. 6   *Technology*, CINEMALL, https://tinyurl.com/23pey42m

Ex. 7   COYOTE DRIVE-IN, https://coyotedrive-in.com/

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                          **<u>Page(s)</u>**

*Ashcroft v. Iqbal*,
 <u>556 U.S. 662</u> (2009)................................................................................................. 4

*Buckley v. Am. Const. Law Found., Inc.*,
 <u>525 U.S. 182</u> (1999)........................................................................................... 2, 13

*Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*,
 <u>555 F.3d 1188</u> (10th Cir. 2009) ......................................................................... 4

*City of L.A. v. Alameda Books, Inc.*,
 <u>535 U.S. 425</u> (2002)................................................................................................. 6

*Digital Ally, Inc., v. DragonEye Tech, LLC*,
 <u>2014 WL 2865592</u> (D. Kan. June 24, 2014)........................................................ 15

*Eichenberger v. ESPN*,
 <u>876 F.3d 979</u> (9th Cir. 2017) .............................................................................. 10

*Feldman v. Star Trib. Media Co. LLC*,
 <u>659 F. Supp. 3d 1006</u> (D. Minn. 2023) .............................................................. 14

*Garza v. Alamo Intermediate II Holdings, LLC*,
 <u>2024 WL 1171737</u> (N.D. Cal. Mar. 19, 2024) ..................................................... 9

*Ghanaat v. Numerade Labs, Inc.*,
 <u>689 F. Supp. 3d 714</u> (N.D. Cal. 2023) ................................................................ 14

*Golden v. NBCUniversal Media, LLC*,
 <u>688 F. Supp. 3d 150</u> (S.D.N.Y. 2023).......................................................... *passim*

*Harris v. Pub. Broad. Serv.*,
 <u>662 F. Supp. 3d 1327</u> (N.D. Ga. 2023) .............................................................. 10

*In re Hulu Priv. Litig.*,
 <u>86 F. Supp. 3d 1090</u> (N.D. Cal. 2015) ............................................................... 10

*In re Hulu Priv. Litig.*,
 <u>2012 WL 3282960</u> (N.D. Cal. Aug. 10, 2012) ................................................. 5, 8

*In re Pac.-Atl. Trading Co.*,
 <u>64 F.3d 1292</u> (9th Cir. 1995) ................................................................................ 5

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ................................................................. 5

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) ........................................................ 15

*Lamb v. Forbes Media LLC*,
2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ....................................................... 15

*Marriott v. USD 204, Bonner Springs-Edwardsville*,
289 F. Supp. 3d 1235 (D. Kan. 2017) ................................................................... 13

*Matal v. Tam*,
582 U.S. 218 (2017) .............................................................................................. 11

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) ...................................................................... 4, 5, 10

*NAACP v. Alabama*,
357 U.S. 449 (1958) .............................................................................................. 12

*Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016) ................................................................................. 14

*Osheske v. Silver Cinemas Acquisition Co.*,
700 F. Supp. 3d 921 (C.D. Cal. 2023) ......................................................... 7, 8, 9, 12

*Paris Adult Theatre I v. Slaton*,
413 U.S. 49 (1973) ................................................................................................ 1, 6

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) ................................................................... 13

*Slaton v. Paris Adult Theatre I*,
185 S.E.2d 768 (Ga. 1971) .................................................................................... 6

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022) ................................................................... 15

*Stewart v. City of Oklahoma City*,
47 F.4th 1125 (10th Cir. 2022) ............................................................................. 13

*Sweezy v. State of N.H. by Wyman*,
354 U.S. 234 (1957) .............................................................................................. 12

*Tanksley v. Rice County Sheriff's Office*,
2021 WL 1210280 (D. Kan. Mar. 31, 2021) ......................................................... 4

*Walker v. Meta Platforms, Inc.*,
  2023 WL 3607282 (N.D. Cal. Mar. 3, 2023)..................................................... 4

*Walsh v. Cal. Cinema Invs. LLC*,
  2024 WL 3593569 (C.D. Cal. July 29, 2024)............................................... 7, 9

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
  536 U.S. 150 (2002)............................................................................... 13

*Young v. Am. Mini Theatres, Inc.*,
  427 U.S. 50 (1976)................................................................................. 6

**Statutes**

18 U.S.C. § 2710...................................................................................... 1

18 U.S.C. § 2710(a)(1)............................................................................... 8

18 U.S.C. § 2710(a)(3)........................................................................... 8, 13

18 U.S.C. § 2710(a)(4)............................................................................... 3

18 U.S.C. § 2710(b)(1)............................................................................... 3

18 U.S.C. § 2710(b)(2)(B).......................................................................... 10

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................. 8

Fed. R. Civ. P. 15(a)(2)............................................................................ 19

**Regulations**

Nondiscrimination on the Basis of Disability; Movie Captioning and Video Description, 75 Fed.
  Reg. 43,467 (July 26, 2010)...................................................................... 6

**Other Authorities**

The Video Privacy Protection Act of 1988, S. REP. 100-599 (1988) ........................... 2, 3, 11, 12

## I.    INTRODUCTION

Plaintiffs Jasmine Bretto and Naomi Kopinsky (together, "Plaintiffs") purchased movie tickets from the website of Defendant AMC Entertainment Holdings, LLC ("Defendant" or "AMC") using private personal computing devices. As alleged, AMC programmed its website, with embedded computer coding known as a pixel, to disclose to Facebook the names of movies for which Plaintiffs and other consumers purchased tickets, along with their personal identifying information, including their unique Facebook IDs ("FIDs"). By doing this, Defendants failed to adhere to the data protection afforded to consumers under the Video Privacy Protection Act of 1988, 18 U.S.C. § 2710 ("VPPA"). As a business that rents, sells, or, as here, *delivers* movies to consumers, Defendant was obligated to protect consumers' personal information. Instead AMC chose to monetize that data by transmitting it to a commercial third party – Facebook. However, in lieu of addressing the merits of Plaintiffs' claims, Defendant seeks a dismissal out of the gate by erroneously claiming that it should not be subject to the consumer protections of the VPPA. As demonstrated below, Defendant's Renewed Motion to Dismiss must be denied for three reasons.

*First*, Defendant is a "Video Tape Service Provider" ("Provider") under the plain language of the statute. Plaintiffs allege that AMC "delivers" "audio visual materials" to consumers in theaters. "Deliver" and "material" are commonly used to describe the movie theater business and are frequently used in contexts where no transfer of possession occurs. For example, the U.S. Supreme Court has addressed "the *delivery* of obscene *material*" in the context of movies shown at an adult theater. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 53 (1973) (emphasis added). Movies shown in theaters today are also "similar" to the audiovisual materials on the "prerecorded videocassette tapes" referenced in the VPPA – *i.e.*, movies. Further, the text of the VPPA does *not* contain words such "home," "private," "public," "view," "watch," or any other words that could

be construed as limiting the VPPA to Providers that deliver movies viewed at home. The opinions Defendant cites (including those on appeal) holding that movie theaters are not Providers should not be given weight because they failed to follow the rules of statutory interpretation of unambiguous text by examining the common usage of the words in the statute or engaging in a close examination of the text.

*Second*, the VPPA's text is not ambiguous and the inquiry into what it means should end there. However, even if the Court were to look at the legislative history, the legislative history supports the application of the VPPA to movie theaters. The legislature expressly includes "open-reel movies" as an example of a "similar audio visual material," the term used in the VPPA's definition of a Provider. At the time, open-reel movies were used by movie theaters. Unequivocally, Congress broadly sought to protect data revealing consumers' movie choices to promote "the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence" guaranteed by the Constitution. S. REP. 100-599 at 7 (1988). These fundamental privacy interests in the consumer's choice of a movie continue to exist in a movie theater. *See, e.g.*, *Buckley v. Am. Const. Law Found., Inc*., 525 U.S. 182, 199-200 (1999) (invalidating name badge requirements for petition circulators because, despite revealing their physical identities, circulators maintained First Amendment interest in anonymity). The VPPA applies to Plaintiffs' movie ticket purchases in this case because AMC's nonconsensual disclosure of their movie choices threatens the fundamental privacy interests protected by Congress, regardless of whether a consumer rents a video in a public space such as a video store or makes a ticket purchase on a movie theater's website.

*Third*, Plaintiffs allege that AMC discloses "personally identifiable information" ("PII") to Facebook. AMC's position that the disclosed information is not PII has already been rejected by

multiple courts. *See*, *e.g.*, *Golden v. NBCUniversal Media, LLC*, <u>688 F. Supp. 3d 150, 158</u> (S.D.N.Y. 2023) ("These allegations—to the effect that a Facebook ID that could be used to identify [the plaintiff], herself, was disclosed—suffice."). AMC does not and cannot distinguish these cases.

At bottom, if Defendant seeks to deny liability and dispute Plaintiffs' averments (and assuredly it will), Defendant will have ample opportunity to do so on a full record at summary judgment or a jury trial, but not at this early stage on a barren record.

## II.    RELEVANT FACTS

The VPPA prohibits Providers from disclosing consumers' movie choices to "any person" without the consent of the consumer. <u>18 U.S.C. § 2710(b)(1)</u>. Providers are persons "engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." <u>18 U.S.C. § 2710(a)(4)</u>. Congress passed the VPPA because it believed that "films are the intellectual vitamins that fuel the growth of individual thought," and "[p]rotecting an individual's choice of books and films is a second pillar of intellectual freedom under the first amendment." S. REP. 100-599 at 4, 7. The disclosure of consumers' movie choices without their knowledge or consent risks chilling the exercise of that right. *Id.* at 7 (cautioning that "[t]he danger here is that a watched society is a conformist society, in which individuals are chilled in their pursuit of ideas"). The VPPA was passed to ensure that individuals can request and obtain movies without fear that they will be judged or mocked for their movie choices, as Judge Robert Bork was when he was nominated to serve on the Supreme Court those many years ago.

As alleged, AMC sells movie tickets from its website: <u>www.amctheatres.com</u> ("Website"). ¶ 3.[1]   Plaintiffs allege AMC disclosed to Facebook the name of the movies for which they

---

[1] Citations to Plaintiffs' Class Action Complaint (<u>Dkt. 1</u>) are referenced as "¶ __."

purchased tickets and their FID, among other information. ¶¶ 6, 35-38. The name of the movie and FID are sent to Facebook at the same time. ¶ 39. The transmission to Facebook is caused by the code AMC installed on the Website. ¶ 42. Specifically, AMC installed the Facebook "pixel" on its Website. ¶¶ 29, 35. Thus, when a user visits or takes an action on the Website, the pixel automatically contacts the Facebook ad server. ¶ 30.

Each Facebook user is assigned a unique FID. ¶ 23. The FID is a digital address that allows anyone, regardless of their technology skills, to identify the Facebook user. For example, anyone can simply Google search the word "Facebook" combined with a FID, and a specific Facebook user's profile will be revealed. ¶ 23. Even more straightforward, a person can navigate directly to a user's Facebook profile by adding the FID to "facebook.com" in the address bar of an internet browser. *Id.* The value for the businesses like AMC in adding the Facebook pixel to their websites is derived from Facebook's ability to identify and link website visitors to Facebook's enormous trove of data, allowing businesses to target advertisements to specific users. ¶ 33.

## III.    ARGUMENT

For a complaint to survive a motion to dismiss under federal Rule 12(b)(6), the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Tanksley v. Rice County Sheriff's Office*, 2021 WL 1210280, at \*5 (D. Kan. Mar. 31, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009); *accord* Fed. R. Civ. P. 12(b)(6).[2]

Here, Defendant moves to dismiss Plaintiffs' Complaint by arguing that (1) movie theaters, like AMC, are not Providers, and (2) the information AMC disclosed is not PII. As demonstrated

---

[2] To state a claim under the VPPA, "a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized[.]" *Walker v. Meta Platforms, Inc.*, 2023 WL 3607282, at \*4 (N.D. Cal. Mar. 3, 2023) (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)).

below, Defendant's arguments fail to provide a basis for dismissal of Plaintiffs' Complaint.

### A.    AMC Is a Video Tape Service Provider under the VPPA.

Courts have found that the consumer protection language of the VPPA "is broad," *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015), and the definition of Provider "unmistakably indicates that Congress intended to cover more than just the local video rental store," *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). "[F]or the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *Id.* "[A] plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video content, *not about how that content was delivered*" or what specific "business model" was used by the Provider. *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *5-6 (N.D. Cal. Aug. 10, 2012) (emphasis added).

### 1.    AMC Is a Provider under the Plain Language of the VPPA.

Plaintiffs allege that AMC's business as a movie theater owner is to deliver pre-recorded video content (*i.e.*, movies) to consumers in theaters. ¶¶ 2, 3.[3] AMC's business is to deliver movies to consumers—it enters distribution contracts, obtains and designs theaters, and installs audiovisual equipment to deliver movies to its customers. Under the common usage of the word "deliver," movie theaters like AMC "deliver" movies to consumers. "Delivery" is included in the definition of Provider in a disjunctive list along with "rental" and "sale," each term having a distinct meaning. *In re Pac.-Atl. Trading Co.*, 64 F.3d 1292, 1302 (9th Cir. 1995) ("In construing a statute, a court should interpret subsections written in the disjunctive as setting out separate and

---

[3] Plaintiffs do not contend that AMC is a Provider because it sells movie tickets. *Cf.* Defs. Renewed Mot. to Dismiss (Dkt. 37) ("Mot.") at 5-6. Thus, AMC's position that it merely sells a license to enter a theater is inapposite, as well as overly reductive and ignores the practical realities necessary for applying a broad consumer protection statute.

distinct alternatives.").

Multiple definitions of "deliver" describe what theaters do with movies, as delivery may include "to send (something aimed or guided) to an intended target or destination"[4] or "[t]o provide something that is promised or expected."[5] "Deliver" is commonly used to describe what movie theaters do. In *Paris Adult Theatre I v. Slaton*, a case concerning adult movie theaters, the U.S. Supreme Court held that the "delivery of obscene material [by a movie theater] ... is not protected under the first amendment." 413 U.S. 49, 53 (1973). The Georgia Supreme Court's use of the term was just as clear, stating that defendants "were making sales and delivery of the films … by selling to the public the right to come into their theater and view the showing of such films." *Slaton v. Paris Adult Theatre I*, 185 S.E.2d 768, 770 (Ga. 1971), *vacated on other grounds*, 413 U.S. 49 (1973). In a proposed rulemaking regarding movie captioning in 2005, the Department of Justice stated that movie theaters now use "a digital mode of movie delivery." 75 Fed. Reg. 43,467. It further stated that analog projectors "deliver the visual portion of a movie." *Id*. Those in the movie theater industry also commonly refer to movie theaters as delivering movies to consumers. Landmark Theatres (defendant in the *Osheske* case, *see infra*) touts its "reputation for delivering the best in specialty, traditional and independent film," and other theaters make similar references.[6]

Movies in theaters are also "similar audio visual materials" under the VPPA. "Audio visual material" simply refers to video content, including that shown in theaters. *See Young v. Am. Mini Theatres, Inc*., 427 U.S. 50, 57 (1976) (discussing the "content of the materials [movie theaters] purvey to the public"); *City of L.A. v. Alameda Books, Inc*., 535 U.S. 425, 445 (2002) (referencing

---

[4] *Deliver* (def. 5), MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/deliver.

[5] *Deliver* (def. II.12.b), OXFORD ENGLISH DICTIONARY (in use since 1944), https://tinyurl.com/2tw2j64c.

[6] *See e.g.*, *FAQ*, LANDMARK THEATRES, https://tinyurl.com/hut2w269 (Ex. 1 at 2); *Technicolor and Bow Tie Cinemas Pact to Deploy Technicolor 3D*, BUSINESS WIRE (Mar. 2, 2010) (Ex. 2 at 1); *How are movies delivered on the cinema screens?*, GALALITE SCREENS, https://tinyurl.com/5kmwe2w8 (Ex. 3 at 4); GQT MOVIES, https://tinyurl.com/mr57bxvr (Ex. 4 at 4); OAKS CENTER, https://tinyurl.com/4h968sfd (Ex. 5 at 2); *Technology*, CINEMALL, https://tinyurl.com/23pey42m (Ex. 6 at 1); COYOTE DRIVE-IN, https://coyotedrive-in.com/ (Ex. 7 at 5).

"the material inside ... movie theaters"). The inclusion of the words "prerecorded" and "audio visual" around the word "similar" makes clear that the video content stored on the tape is the focus of the term, not where, how or whether the video content is watched. Thus, the word "similar" simply means that the VPPA includes any video content "similar" to that typically recorded on videocassette tapes. Films in theaters are "similar" to video cassette tapes in rental stores because both contain precisely the same pre-recorded video content—movies. Other video content, such as commercials, are not similar because they were not traditionally recorded on videocassette tapes. *Cf.* Mot. at 9 (mischaracterizing Plaintiffs' interpretation of "similar" as "any other").

AMC's conduct qualifies it as a Provider regardless of whether movie theaters are expressly named in the VPPA, which does not include or exclude any specific type of business. *See Golden,* 688 F. Supp. 3d at 156 (definition of Provider "looks to a video's format," *i.e.*, prerecorded, "rather than its subject matter or the provider's identity"). The VPPA is structured differently than the statutes AMC relies on. The explicit language of the VPPA is broad enough to include movie theaters, regardless of whether movie theaters are expressly named. *Cf.* Mot at 11.

The opinions cited by AMC (most of which are on appeal) holding that movie theaters do not fall within the plain language of Provider are not persuasive for several reasons. First, the holding in *Osheske v. Silver Cinemas Acquisition Co.,* 700 F. Supp. 3d 921 (C.D. Cal. 2023), *appeal filed,* No. 23-3882 (9th Cir. Nov. 30, 2023), that "delivery" requires Providers to transfer a possessory interest in audio visual materials to the consumer, fails upon close examination because it improperly reads into the VPPA words and concepts that are not there. *See also Walsh v. Cal. Cinema Invs. LLC,* 2024 WL 3593569, at *3 (C.D. Cal. July 29, 2024) (same); *Christopherson v. Cinema Ent. Corp.,* Case No. 23-cv-03614 (D. Minn. Sept. 17, 2024), *on appeal,* No. 23-3042 (8th Cir. Oct. 7, 2024) (ECF 37-3 at 7-8) (same); *Hoge v. VSS-Southern Theatres LLC,* Case No. 23-

cv-00346 (M.D.N.C. Sept. 10, 2024), *on appeal*, No. 24-2009 (4th Cir. Oct. 9, 2024) (ECF 37-2 at 5) (same). All of these opinions fail to acknowledge or address the application of the word "deliver" to movie theaters by the Supreme Court, the Georgia Supreme Court, the DOJ, and movie theaters themselves. The *Osheske* court's holding that "to say a movie theater 'delivers' movies is to stretch the natural meaning of the verb beyond recognition" is nothing more than factually unsupported conjecture. *Osheske*, 700 F. Supp. 3d at 925.

The cases cited above also failed to examine whether requiring a transfer of a possessory interest is consistent with the VPPA's express structure, which includes the provision of "services" within its protection. *See also* 18 U.S.C. § 2710(a)(1) (defining "consumer" as "any renter, purchaser, or subscriber of goods or services"); *id.* § 2710(a)(3) (PII includes "information which identifies a person as having requested or obtained specific video materials or services"). Significantly, the term "Video Tape Service Provider," the interpretation of which is at the heart of the issue before the Court here, explicitly includes a provider of "services." Movie theaters which "deliver" audiovisual materials as part of their "services" fit squarely within the language of the VPPA.

The definition of PII further confirms that a transfer of possession is not essential under the VPPA. PII includes data that "identifies a person as having *requested or obtained*" materials or services. 18 U.S.C. § 2710(a)(3) (emphasis added). A request could include, for example, a hold at a rental store. No transfer of possession occurs upon a request. There is no requirement in the VPPA, as AMC claims, that a person have "the physical ability to immediately access and view [a] video," at home or otherwise. Mot. at 8.

Requiring a transfer of a possessory interest would also render the VPPA a dead letter because it undermines the VPPA's well-accepted application to video streaming services. *See In*

*re Hulu Priv. Litig.*, 2012 WL 3282960, at *4 (rejecting Hulu's argument that the audio visual materials must be "composed of physical matter"). A streaming subscription, like Hulu or Netflix, provides access to a changing library of content, not a possessory interest in any one movie. To avoid rendering the VPPA obsolete, the courts in *Osheske*, *Walsh,* and *Christopherson* distinguish streaming services by positing that such services provide movies viewed at home. *Osheske*, 700 F. Supp. 3d at 926 n.3; *Walsh*, 2024 WL 3593569, at *4; *Christopherson* at 5. While that may be so, home viewing is not grounded in the text of the VPPA and misses the point. The VPPA protects consumer data; it does not reference concepts of public, private, home, view, or any other words that unambiguously or ambiguously suggest that the location of where a consumer views a movie is relevant. The text protects data revealing movie choices regardless of where, if, or with whom the consumer views a movie.

Second, the court in *Garza v. Alamo Intermediate II Holdings, LLC*, 2024 WL 1171737 (N.D. Cal. Mar. 19, 2024), *on appeal*, No. 24-2165 (9th Cir. Apr. 8, 2024), also failed to examine common use of the key terms in the VPPA when it found that applying the word "deliver" to movie theaters relied on "idiosyncratic" definitions. 2024 WL 1171737, at *1. For example, the court held that movie theaters do not "deliver" movies because "people go to the movies, not the other way around." *Id.* However, "deliver" is used in many contexts not involving delivery to a consumer's home, such as with a PO Box or movie theaters' statements that they "deliver" movies. *See* Ex. 1 at 2. The *Garza* court also made unsupported and illogical factual assumptions when holding that movie theaters do not "deliver" because they do not involve "the act of 'bringing' something to a particular person or place." *Id.* This is precisely what movie theaters do. AMC's entire business is dedicated to bringing movies to patrons in theaters.

### 2.    The Plain Text Does Not Require Home or Private Delivery .

AMC argues that the VPPA's "plain language demonstrates that Congress did not intend

for movies shown in public theaters to fall within the statute's scope," and that viewing a movie "with strangers in public for anyone to see" is not protected under the VPPA. Mot. at 8-10. This argument fails as AMC's limiting language is self-created and does not exist in the text.

The VPPA does not rely on the act of viewing at all, but instead prohibits *disclosure* of information that reveals a consumer's movie choices. *See In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) ("The point of the [Act], after all, is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos."). A Provider's obligations under the VPPA arise the moment PII is created, not when (or if, or where, or with whom) a consumer views a movie. *See, e.g., Golden*, 688 F. Supp. 3d at 161 (liability under the VPPA does not "turn on whether the plaintiff whose video access was disclosed had actually watched the video(s)"); *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1336 n.3 (N.D. Ga. 2023) ("Nowhere does the [Act] require that the consumer actually watch the video."). Accordingly, the text contains no requirements about where Providers must deliver movies.

A home delivery requirement is also inconsistent with the VPPA's structure which imposes no confidentiality requirement on consumers. Providers can disclose Personal Information to third parties only with the consumer's consent, regardless of whether the consumer discloses the information to others. *See* 18 U.S.C. § 2710(b)(2)(B). *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) ("The fact that a subscriber may permit third parties to access her account, thereby allowing third parties to view Netflix's disclosures, does not alter the legal status of those disclosures."). Instead, the VPPA gives consumers control over their data, including the power to disclose the data to whom they choose, whether it's a neighbor at the video rental store, a stranger in the checkout line at a store, a stranger in a dark movie theater, or 1,000 of their social media followers. *See Eichenberger v. ESPN*, 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "ensur[es]

that consumers retain control over their personal information"). Consumers entering a movie theater expect that other consumers might be there, and voluntarily disclose their viewing information to them. They do not expect Facebook to be in the theater linking the name of the movie to their FID, creating a record of the event for advertisers and Facebook's financial benefit.

### 3. Applying the VPPA to Movie Theaters Is Consistent with the Legislative Purpose.

As demonstrated above, the definition of Provider is not ambiguous, and the Court need not look to the legislative history to interpret the VPPA. *See Matal v. Tam*, <u>582 U.S. 218, 232-33</u> (2017) (rejecting a proposed "resort to legislative history" as unpersuasive because a court's "inquiry into the meaning of the statute's text ceases when 'the statutory language is unambiguous and the statutory scheme is coherent and consistent'" (citation omitted)). However, should the Court find ambiguity, the legislative history supports Plaintiffs' allegation that AMC is a Provider.

First, Congress was motivated to pass the VPPA because of sophisticated information-tracking enabled by "the growth of computer checking and check-out counters, of security systems" that would make it "relatively easy at some point to give a profile of a person and tell what they buy in a store." S. REP. 100-599 at 5-6. This is precisely what has transpired. Movie theaters have undergone the change that Congress anticipated—evolving from all cash transactions at the time the VPPA was passed to conducting a majority of ticket sales online through computers.[7] The online purchase of movie tickets has only very recently grown in importance. For example, in 2014, AMC reported that only 10.3% of movie tickets were purchased online,[8] but by

---

[7] It was not until 1989—one year after the VPPA was passed—that some theaters in Los Angeles even began to accept credit card payments. *Going to the Movies? Now You Can Put It on Your Card* (May 1, 1989), Los Angeles Times, https://www.latimes.com/archives/la-xpm-1989-05-01-ca-2350-story.html (last visited Nov. 29, 2023).

[8] AMC Entertainment Holdings, Form 10-K for the fiscal year ending Dec. 21, 2013 at 10, https://www.sec.gov/Archives/edgar/data/1411579/000104746914001769/a2218535z10-k.htm.

2022, that number grew to approximately 67%.[9] Moreover, the Facebook pixel was not released until 2015.[10] Although the technology for selling movie tickets has changed, the privacy interest in the protected data that Congress defined in the VPPA has not.

Second, Congress's inclusion of "open-reel movies" as an example of "similar audio-visual materials," S. REP. 100-599 at 12, confirms that public conduct revealing movie choices does not vitiate the VPPA's protections. In 1988, commercial open-reel movies were predominately watched in movie theaters. Open-reel players were "too bulky and expensive for general consumption" and, aside from movie theaters, "were often widely used commercially in schools and other institutions," *i.e.*, public spaces.[11] The *Osheske* court erred by dismissing this fact and substituting its own personal experience as a basis for its decision when it recalled "viewing open-reel home movies in the 1970s." *See* 700 F. Supp. 3d at 927 n.6. However, "home movies" are not relevant to the VPPA because businesses did not rent, sell, or deliver home movies that were recorded by consumers. The VPPA concerns only commercial open-reel movies that were typically shown in theaters or other public places.

Third, the right to privacy that Congress sought to protect and define continues to exist in public spaces. Congress directly acknowledged that "the relationship between the right of privacy and intellectual freedom is a central part of the first amendment." S. REP. 100-599 at 4 (citing *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (holding that Alabama could not obtain the membership lists of the NAACP)). The Supreme Court has repeatedly held that the First Amendment right to privacy is retained even as to acts conducted in public. For example, in *Sweezy*

---

[9] AMC Entertainment Holdings, Form 10-K for the fiscal year ending Dec. 31, 2021 at 12, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411579/000141157923000038/amc-20221231x10k.htm.
[10] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015),
https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.
[11] Dillon Wallace, *What came before VHS?*, SOUTHTREE, https://tinyurl.com/yuwunufb.

*v. State of N.H. by Wyman*, 354 U.S. 234, 243-44 (1957), the Court upheld the right of an individual

to refuse to disclose to state authorities the subjects of a lecture he had delivered to a class of 100

students at the University of New Hampshire. In *Buckley*, 525 U.S. at 199-200, the Court

invalidated a name badge requirement for petition circulators seeking signatures in face-to-face

interactions. The Court held that the fact that circulators revealed their physical identities did not

foreclose consideration of the circulators' First Amendment interest in maintaining their

anonymity. *Id.* And in *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536

U.S. 150, 166 (2002), the Supreme Court found that an ordinance requiring door-to-door

canvassers to identify themselves in a permit application filed with the mayor's office

impermissibly "results in a surrender of [] anonymity," and invalidated the ordinance regulating

purely public conduct. Going into a dark movie theater with strangers does not reveal one's

identity—or sacrifice the right to privacy in data regarding that activity—any more than door-to-

door canvassing, handing out petitions, or renting a video at a public video rental store.[12] Even so,

*liability attaches with disclosure of PII* and does not require a customer to actually go the theater.

### B.    AMC Disclosed Personally Identifiable Information.

The VPPA provides that PII "includes information which identifies a person as having

requested or obtained specific video materials or services from a video tape service provider."

18 U.S.C. § 2710(a)(3). "Courts have interpreted this to require that a video tape service provider

have disclosed information that 'at the very least, identif[ies] a particular person—not just an

anonymous individual—and connect[s] this particular person with his or her viewing history.'"

*Golden*, 688 F. Supp. 3d at 158 (quoting *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179

---

[12] AMC relies only on inapposite cases which primarily concern physical privacy in public spaces. *See Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1134 (10th Cir. 2022) (concerning "statements made during a profane altercation that occurred in full public view"); *Marriott v. USD 204, Bonner Springs-Edwardsville*, 289 F. Supp. 3d 1235, 1239-40 (D. Kan. 2017) (privacy rights protected by the Fourth and Fourteenth Amendments).

(S.D.N.Y. 2015) (alterations in original)).

Plaintiffs allege facts showing that AMC programmed its Website to send to Facebook (i) the name of the movies for which Plaintiffs purchased tickets, and (ii) Plaintiffs' FID. ¶¶ 45, 46, 55, 64. An FID is stored on a user's device and is an identifying digital address for that person's Facebook profile. ¶¶ 23, 46, 80. While the FID is stored on a user's device, AMC programmed its website to cause that information to be disclosed along with the viewing information. ¶ 31. "Businesses using Facebook services know that Facebook can identify the Facebook users visiting their websites" and that this is one of the primary purposes for installing the pixel. ¶ 33. With an FID, any ordinary person could go to Facebook.com, enter the numbers, and a specific person's Facebook profile immediately appears on the screen. A simple Google search of the number and "Facebook" also brings up a specific person's profile. This process is simple, takes just a few seconds, and could be performed by any person using the Internet (¶ 23) "with little or no extra effort." *Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284 (3d Cir. 2016). *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) at *9 ("[FID] is both reasonably comprehensible and plausibly as usable as [] GPS data").

"Courts have uniformly held Facebook IDs to constitute PII under the VPPA, particularly where" the plaintiff alleges that their "Facebook ID was disclosed alongside the viewed video's URL and name." *Golden*, 688 F. Supp. 3d at 160 (finding FID meets both the broad standard for PII in the First Circuit and the narrower standard adopted by the Third and Ninth Circuits). *See also Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721 (N.D. Cal. 2023) ("Most, if not all, courts to address the question have found at the pleading stage that Facebook IDs are PII."); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d at 1022 ("courts that have addressed the use of Facebook Pixel specifically reached this same result [re PII] in the context of Rule 12(b)(6)

14

motions") (collecting cases).

Courts routinely reject AMC's contention that Plaintiffs must allege that their profiles contain personal information. *See Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 853 (N.D. Cal. 2022) ("[I]t is unlikely that a Congress intended a video rental business could avoid liability ... by asserting that it had not verified that every customer on the list used their real name when creating an account."). Regardless, Plaintiffs allege that Facebook users must use the name they use in "everyday life," including "first and last name" and "must also provide their birthday and gender." ¶ 22. No more is required. *See Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) (court reasonably inferred that "an ordinary person could readily identify a specific Facebook user on the basis of a [FID]" where plaintiff alleged that "a user's Facebook profile may contain the user's 'name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts'"). Here, there can be no legitimate dispute that the disclosed information is PII, as the information disclosed to third parties readily identifies AMC's purchasing customers by their FIDs and viewing choices.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court deny AMC's Motion in its entirety. If, however, the Court finds any part of the Complaint insufficient, Plaintiffs respectfully request leave to amend. Federal Rule of Civil Procedure 15(a)(2) provides that courts should "freely give leave [to amend] when justice so requires." *See Lamb v. Forbes Media LLC*, 2023 WL 6318033, at *14 (S.D.N.Y. Sept. 28, 2023) ("an amendment could fortify Plaintiffs' claim to have been subscribers under the VPPA"). "The Court may deny leave to amend upon a showing of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, and futility of amendment,'" none of which are present here. *See Digital Ally, Inc., v. DragonEye Tech, LLC*, 2014 WL 2865592, at *2 (D. Kan. June 24, 2014) (citation omitted).

Dated: November 26, 2024                    Respectfully submitted,


                                            */s/ Paul D. Sinclair*
                                            Paul D. Sinclair (KS Bar No. 22799)
                                            **COWING & MENDELSON, P.C.**
                                            3300 N.E. Ralph Powell Road
                                            Lee's Summit, MO 64064
                                            Tel.: (816) 373-8881
                                            Fax: (816) 373-8876
                                            Email: Paulsinclair219@gmail.com


                                            Sherrie R. Savett (admitted *pro hac vice*)
                                            Barbara A. Podell*
                                            Lane L. Vines (admitted *pro hac vice*)
                                            **BERGER MONTAGUE PC**
                                            1818 Market Street, Suite 3600
                                            Philadelphia, PA 19103
                                            Tel.: (215) 875-3000
                                            Email:ssavett@bm.net
                                                    bpodell@bm.net
                                                    lvines@bm.net


                                            Sophia M. Rios (admitted *pro hac vice*)
                                            **BERGER MONTAGUE PC**
                                            8241 La Mesa Blvd., Suite A
                                            La Mesa, CA 91942
                                            Tel.: (619) 489-0300
                                            Fax: (215) 875-4604
                                            Email: srios@bm.net


                                            * *Pro hac vice* motion to be filed

                                            *Attorneys for Plaintiffs and the proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on November 26, 2024, he caused a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AMC ENTERTAINMENT HOLDINGS, INC.'S RENEWED MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM to be filed electronically. Notice of this filing will be sent through the Court's CM/ECF system to counsel of record.

*/s/ Paul D. Sinclair*
Paul D. Sinclair (KS Bar No. 22799)
**COWING & MENDELSON, P.C.**
3300 N.E. Ralph Powell Road
Lee's Summit, MO 64064
Tel.: (816) 373-8881
Fax: (816) 373-8876
Email: Paulsinclair219@gmail.com

# EXHIBIT 1

PLEASE SELECT A LOCATION





LANDMARK THEATRES

CELEBRATING 50 YEARS
1974 – 2024



# FREQUENTLY ASKED QUESTIONS

**What kinds of films do you play?**   ∨

**How can I purchase tickets on your website?**   ∨

**When are the show times available on the website?**   ∨

**Why am I discouraged from purchasing seats designated for companions of individuals using wheelchairs?**   ∨

**I bought my tickets online and I have my confirmation email, now what?**   ∨

**What is your age break for senior citizens?**   ∨

**Do you have equipment to assist the hard of hearing?**   ∨

**How do I get a hard of hearing device?**   ∨

**How can I get a refund?**   ∨

## What is your holiday pricing policy?

## What are your hours of operation?

## Why aren't the direct phone lines to the theatre available anywhere?

## Can you tell me if a specific film will play at my favorite Landmark Theatre?

## Why can't you tell me how long a film will play at your theatre?

## Why did the movie I wanted to see leave after only a week or two?

## Why are there so many films with subtitles?

Landmark has a reputation for delivering the best in specialty, traditional and independent film. We have achieved this distinction in part by highlighting acclaimed films from all over the world. Many of these films are from other countries and produced in a foreign language. Subtitles are needed to bring these films to our theatres for your enjoyment, and allow you to experience the voice performances of the original cast. In the case of foreign animated films, we often show them in two versions: original language with subtitles, and dubbed into English. To find out if the film you are interested in is subtitled, click on the MORE INFO button on the market page; this information is always contained in the synopsis of the film.

## What kinds of foods do you offer?

## Will my Screen Actors Guild (SAG) card grant me free admission to your theatre?

## Is there free parking?

## Is it possible to rent a theatre and if so who do I contact?

## How do I purchase a Discount Card?

# What do the film ratings mean and who can be admitted to these films?



| | |
|---|---|
| ABOUT US | FAQ |
| 50TH ANNIVERSARY OFFERS | PRIVACY POLICY |
| ACCESSIBILITY | TERMS |
| CONTACT US | LOYALTY TERMS |
| DOWNLOAD APP (IOS) | STORE TERMS & CONDITIONS |
| DOWNLOAD APP (ANDROID) | DMCA |
| ADVERTISE ONSCREEN | CA PRIVACY NOTICE |
| | YOUR PRIVACY CHOICES |
| | COOKIE SETTINGS |



© Landmark Theatres

# EXHIBIT 2

**News**Room

3/2/10 Bus. Wire 13:00:00

Business Wire
Copyright © 2010 Business Wire

March 2, 2010

Technicolor and Bow Tie Cinemas Pact to Deploy Technicolor 3D

Business Editors/Entertainment Editors

HOLLYWOOD--(BUSINESS WIRE)--March 2, 2010--Technicolor (Euronext Paris: 18453) (NYSE: TCH) has reached an agreement with New York City-based Bow Tie Cinemas to install Technicolor 3D in all Bow Tie locations on 25 of its 150 screens. Technicolor 3D is a new 3D system for 35mm projectors, enabling exhibitors to equip theatres for high-quality 3D at a fraction of the cost of installing a digital 3D projection system.

The Technicolor 3D system utilizes a next-generation 3D lens for projectors and film prints created with patent-pending digital processes to optimize the motion picture image for 35mm 3D projection. Bow Tie will install Technicolor 3D in advance of the first film available in the Technicolor 3D format: How to Train Your Dragon from DreamWorks Animation SKG, Inc. on March 26.

"Our customers have resoundingly expressed their desire to see 3D films and we have responded by making sure that top quality 3D presentation will be a part of the movie-going experience at every Bow Tie Cinema," said Ben Moss, CEO of Bow Tie Cinemas. "Technicolor 3D delivers the high-quality presentation that our customers expect, and allows us to utilize our existing equipment to accommodate the crowded upcoming 3D release schedule."

"We're proud to launch Technicolor 3D with our partners at Bow Tie Cinemas," said Joe Berchtold, president of Technicolor's Creative Services business. "19 3D movies have already been announced for 2010, and less than 10% of screens worldwide currently have digital 3D capability. We've developed a high-quality solution that addresses the 3D screen scarcity issue and allows exhibitors an affordable way to bridge the gap to digital."

Technicolor 3D Motion Picture Support

DreamWorks Animation SKG, Inc., Lionsgate, Paramount Pictures, Overture Films, Universal Pictures, Warner Bros., and The Weinstein Company have announced support for Technicolor 3D. These studios represent 13 of the 19 3D films already announced for 2010 release.

How Technicolor 3D Works

Technicolor 3D employs a proprietary "production to projection" system that leverages 35mm film projectors, in use today by the majority of U.S. and international theatres, to deliver a high-quality 3D presentation to moviegoers. A patent-pending lens system splits the left and right eye images as the film runs through the projector and delivers a 3D-ready image onto a silver screen. The solution works with circular polarized glasses — identical to the ones used for existing digital 3D cinema — to "translate" the film's content into an image that is perceived by the viewer as being three-dimensional. The silver screen can

be used for the projection of both Technicolor 3D as well as digital 3D content. Technicolor 3D is available now in the U.S., Canada, Mexico, select European countries, and Japan.

Technicolor is a company listed on NYSE Euronext Paris and NYSE stock exchanges, and this press release may contain certain statements that constitute "forward-looking statements" within the meaning of the "safe harbor" of the U.S. Private Securities Litigation Reform Act of 1995. Such forward-looking statements are based on management's current expectations and beliefs and are subject to a number of risks, uncertainties, assumptions and other factors beyond Technicolor's control that could cause actual results to differ materially from the future results expressed, forecasted or implied by such forward-looking statements due to changes in global economic and business conditions, risks related to its debt restructuring, and risks related to its operations in general. For a more complete list and description of such risks and uncertainties, refer to Technicolor's Form 20-F (formerly Thomson) and other filings with the U.S. Securities and Exchange Commission and Technicolor's Rapport Annuel and other filings with the French Autorité des marchés financiers.

About Technicolor

With more than 95 years of experience in entertainment innovation, Technicolor serves an international base of entertainment, software, and gaming customers. The company is a leading provider of production, postproduction, and distribution services to content creators and distributors. Technicolor is one of the world's largest film processors; the largest independent manufacturer and distributor of DVDs (including Blu-ray Disc); and a leading global supplier of set-top boxes and gateways. The company also operates an Intellectual Property and Licensing business unit. For more information: www.technicolor.com

About Bow Tie Cinemas

The history of Bow Tie Cinemas begins over 100 years ago, in the era of the Nickelodeon, when B.S. Moss began his long and illustrious career providing popular entertainment to the public. The business of operating street front Nickelodeons quickly gave way to Vaudeville, which was the heart of B.S. Moss Theaters until the 1930s when B.S. Moss sold his last Vaudeville theater and dedicated himself fully to building and operating motion picture theaters. In 1936, B.S. Moss opened the Criterion Theater, known then as The Theater of Tomorrow, on Broadway in the heart of Times Square. The Criterion was the first motion picture theater built exclusively for the exhibition of talking motion pictures. It operated continuously for 63 years and was the home of several major New York film premiers including Sleeping Beauty, My Fair Lady, Funny Girl, Lawrence of Arabia and Alien. Today, Bow Tie Cinemas is dedicated to returning style and elegance to the movie-going experience. In each of its 18 locations and 150 screens, Bow Tie Cinemas provides the best possible presentation and service to its patrons, continuing in the tradition of its founder. For more information on Bow Tie Cinemas, please visit www.bowtiecinemas.com

Technicolor
Season Skuro
+1 818 371 0006
season.skuro@technicolor.com
or
Hill & Knowlton
Julie Mathis
+1 415 281 7189
julie.mathis@hillandknowlton.com

State Keywords: California
Industry Keywords: Entertainment; Technology; Hardware; Audio/Video; Other Technology; Film & Motion Pictures
Source: Technicolor

---- Index References ----

Company: THOMSON SA; CRITERION; TECHNICOLOR

News Subject: (Licensing (1LI80); Exchange Listings & Delistings (1EX12); Financial Markets (1FI87); Major Corporations (1MA93); Economics & Trade (1EC26); Entertainment Law (1EN33))

Industry: (Software Products (1SO56); Electronics (1EL16); Multimedia Software Applications Development (1MU49); I.T. (1IT96); Application Software Development (1AP78); Software (1SO30); Entertainment (1EN08); Press Releases (1PR19); Consumer Products & Services (1CO62); Multimedia Production, Graphics & Publishing Software (1MU67); Consumer Electronics (1CO61); Cable Set Top Boxes (1CA79); 3D Animation & Rendering (13D60); Financial Services (1FI37); Application Software (1AP32); Telecom Consumer Equipment (1TE03))

Region: (Northern Europe (1NO01); New York (1NE72); Americas (1AM92); USA (1US73); Europe (1EU83); Scandinavia (1SC27); France (1FR23); North America (1NO39); Norway (1NO68); Western Europe (1WE41))

Language: EN

Other Indexing: (3D; ARABIA ALIEN; BOW; BOW TIE; BOW TIE CINEMA; BOW TIE CINEMAS; CREATIVE SERVICES; CRITERION; CRITERION THEATER; DEPLOY TECHNICOLOR; EXCHANGE COMMISSION; FILM MOTION PICTURESSOURCE; FRENCH AUTORITÉ; INTELLECTUAL PROPERTY; RAPPORT ANNUEL; STATE KEYWORDS; TCH; TECHNICOLOR; TECHNICOLOR 3D; TECHNICOLOR 3D MOTION PICTURE; TIMES SQUARE; US PRIVATE SECURITIES; US SECURITIES) (B.S. Moss; B.S. Moss Theaters; Cinemas; Cinemas Pact; DreamWorks Animation; Funny Girl; Joe Berchtold; KnowltonJulie Mathis; Overture Films; Paramount Pictures; Sleeping Beauty; TechnicolorSeason Skuro; Tie Cinemas; Universal Pictures) (North America)

Keywords: Entertainment; Technology; Hardware; Audio/Video; Other Technology; Film & Motion Pictures; California (Contract/Agreement); (Product/Service)

Ticker Symbol: TCH; 18453

Word Count: 933

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.



---

EXHIBIT 3



Send
Enquiry

Home

Upgrade to Galalite

Products ⌄

About Us ⌄

Contact Us ⌄

# HOW ARE MOVIES DELIVERED ON THE CINEMA SCREENS?

## HOW ARE MOVIES DELIVERED ON THE CINEMA SCREENS?



Movies have been an integral part of entertainment for people all over the world for many years. While watching movies at home has become more accessible through OTT services, there's still something magical about watching a movie in a theatre.

But have you ever wondered how movies are displayed on cinema screens? In this blog, we'll take a look at the technology behind it.A film projector, sound system, and screen are the three primary components that come to mind when thinking about movie theatres.

- **The film projector** handles the screening of the movie,

- **The sound** system produces the audio,
- **The screen provides** a visual display. But, with the advancement of technology, things have changed.

# DCP

Nowadays, **Digital Cinema Packages (DCPs)** have replaced traditional 35mm film prints as the primary medium for movies. A digital cinema package (DCP) is a collection of digital files used for exhibiting movies in cinemas.

It contains all the necessary digital information required for playing a movie, including the video, audio, and subtitles. Unlike traditional film prints, DCPs are stored on a hard drive or a server, making them easier to transport and distribute.

## DCPs offer a range of benefits over traditional film prints. Following are some of its advantages

1. DCPs provide better image and sound quality, as they are not subject to the wear and tear associated with traditional film prints.
2. They are also more reliable, as they don't suffer from issues like scratched or damaged film.
3. Additionally, DCP can be easily replicated and distributed, making it easier for movie studios to release their movies globally.

# Projector

**Projectors are the primary devices** used in cinemas to display the digital content stored in the DCP. They work by projecting a bright beam of light through the DCP and onto the cinema screen, creating a large-scale image that audiences can enjoy.

# Laser projectors

**Modern projectors use laser technology-based projectors.**

A laser projector is an innovative device that projects **laser beams** on a screen to create dynamic moving images for **both entertainment and professional purposes**. Its components typically include **lasers, mirrors, galvanometer scanners**, and **other optical components**.

Laser projectors utilize a solid-state laser light source that delivers consistent brightness throughout the projector's lifespan, reducing the need for frequent lamp replacements. Furthermore, they offer a longer lifespan and require minimal maintenance, making them a cost-effective option for businesses and home theatres.

Laser projectors are also highly versatile in terms of placement, allowing them to project from various angles and distances without compromising image quality. The only drawback is that they create speckles on silver projection screen surfaces.

# Cinema Screen

A cinema screen is a large surface used for displaying projected images in movie theatres. It is typically made of a **highly reflective material** that ensures the projected image is bright and clear, even in a darkened theatre.

The cinema screen is an essential component of the cinema experience, as it plays a crucial role in creating an immersive environment for the audience. The cinema screen is designed to deliver the best possible visual experience for moviegoers.

Its size, aspect ratio, gain, and surface texture all contribute to creating an immersive cinematic experience. The screen's size and aspect ratio determine the width and height of the image displayed, while the gain and surface texture determine the screen's ability to reflect and diffuse light, respectively.

A well-designed cinema screen is essential for delivering high-quality images that capture the audience's attention and transport them into the world of the movie.

# This is where Galalite's Mirage XDL 1.2. becomes your hero

It is the world's most advanced cinema projection screen! Designed with **cutting-edge technology**, this screen is a game-changer in the cinema industry. With the lowest gain ever seen in the **silver screens range**, the Mirage XDL 1.2 is expertly crafted to reduce speckle in laser projectors, delivering unrivaled clarity for viewers.

But that's not all! Mirage XDL 1.2., also **maximizes black levels on-screen, offering a brilliant and immersive movie-watching experience**. Perfectly suited for the latest **RGB laser projections**, the Mirage XDL 1.2 is the ideal choice for next-generation screens.

So you can say goodbye to lackluster visuals and hello to an unparalleled cinema experience with the Mirage XDL 1.2.

Along with Galalite's LENSRAY Technology, it's a marvel that redefines picture quality and takes the strain off your eyes. With reduced visual noise and improved viewing angles, you can now enjoy a more immersive and comfortable movie experience.

**LENSRAY Technology** also scatters light up to 20%, diminishing hot spotting and enhancing every detail. Experience the magic of LENSRAY Technology in Galalite's Mirage, Prism 3D, and Digilite screens.

In conclusion, the technology behind movie theatres has evolved tremendously, with digital cinema packages (DCP), advanced laser projectors, and specially designed cinema screens enhancing the cinematic experience.

Galalite's Mirage XDL 1.2, equipped with cutting-edge technology, stands out as the world's most advanced cinema projection screen, delivering unparalleled clarity and an immersive movie-watching experience.

Ready to experience cinema like never before? Wave goodbye to visual noise and greet yourself with improved viewing angles with **Galalite's LENSRAY Technology**! With movie magic this good, you won't want to watch it anywhere else. So grab some popcorn and get ready to be wowed!

**RECENT POST**

Behind the Silver Screen: FAQs of Cinema Owners

Signs you need to replace your cinema screen

Galalite Screens Around the World: Showcasing Global Installations

A Recap of Galalite's Presence at Cine Europe 2024

How can solar energy be used in cinemas?

**IMPORTANT LINKS**

Home

Upgrade to Galalite

Products ›

About Us ›

Contact Us ›

Galalite®, the flagship brand of GTC industries which manufactures the widest range of innovative Projection Screen surfaces, ensures better movie viewing experiences with the assurance of high performance efficiency, absolute value-for-money and time bound delivery.

   

Copyrights 2024 | All Rights Reserved | Designed & Developed by Openspace

EXHIBIT 4

9/26/24, 4:21 PM                    Showtimes - GQT Pittsburgh Mills Cinemas

GQT movies    Download our app for iOS and Android.         ✕



**Tuesdays**

$5.50

Excludes GDX, 3D, Fathom Events & Specialty Shows

LOCATIONS

GQT PITTSBURGH MILLS CINEMAS ⌄

MOVIES

Now Playing        Advance Tix        Coming Soon

|  | SEP | TODAY 26 | FRI 27 | SAT 28 | SUN 29 | MON 30 | OCT | TUE 01 | WED 02 | THU 03 | FRI 04 | SAT 05 | SUN 06 | MON 07 |  |

## MOVIES AT GQT PITTSBURGH MILLS CINEMAS

Showtimes and Trailers for GQT Pittsburgh Mills Cinemas



**THE WILD ROBOT**

PG    1H 41M

General Admission



**TRANSFORMERS ONE**

PG    1H 44M

General Admission

| 2:00P | 4:30P | 5:45P | 7:00P | 8:15P | 9:30P |
| EXPIRED | EXPIRED | EXPIRED | EXPIRED | | |

| 10:45A | 11:45A | 1:30P | 4:10P | 6:45P | 9:15P |
| EXPIRED | EXPIRED | EXPIRED | EXPIRED | EXPIRED | |



### NEVER LET GO

R  1H 41M

General Admission

| 11:15A | 2:15P | 4:45P | 7:10P | 9:55P |
| EXPIRED | EXPIRED | EXPIRED | EXPIRED | |



### LONG GONE HEROES

R  1H 32M

General Admission

9:40P



### AND MRS

R  1H 41M

General Admission

11:30A
EXPIRED



### SPEAK NO EVIL

R  1H 50M

General Admission

| 11:00A | 1:45P | 4:30P | 7:00P | 9:35P |
| EXPIRED | EXPIRED | EXPIRED | EXPIRED | |



### AM I RACIST?

PG-13  1H 41M

General Admission

10:30A  1:15P   4:00P   9:45P
EXPIRED  EXPIRED  EXPIRED



### BEETLEJUICE BEETLEJUICE

PG-13  1H 44M

General Admission

10:15A  12:45P  2:00P   3:30P   4:30P   6:15P
EXPIRED  EXPIRED  EXPIRED  EXPIRED  EXPIRED  EXPIRED

7:30P   8:45P



### GOD'S NOT DEAD: IN GOD WE TRUST

PG  1H 36M

General Admission

2:30P
EXPIRED



### REAGAN

PG-13  2H 15M

General Admission

10:45A
EXPIRED





### HOWL'S MOVING CASTLE 20TH ANNIVERSARY - STUDIO GHIBLI FEST 2024 (SUB)

PG    1H 59M

General Admission

**7:00P**
EXPIRED



GQT Pittsburgh Mills Cinemas
View larger map

## About GQT Pittsburgh Mills Cinemas

590 Pittsburgh Mills Cir
Tarentum, PA 15084

(724) 367-6040
pittsburghmills@gqtmovies.com

GQT Pittsburgh Mills Cinemas delivers movies, munchies and memories with a focus in value, cleanliness and customer care. Featuring 6 screens with all digital projection and rocker seats. Doors open a half-hour prior to the first showing. As a reminder, Guests aged 16 and under must be accompanied by a parent or guardian (over 21 years old) for movies starting at 6 PM or later. The guardian must remain present for the entire duration of the movie. If the guardian leaves before the movie ends, any unaccompanied guest 16 years and younger will be asked to exit. No refunds will be provided to guests asked to leave due to rule violations or behavioral issues.



SHOWTIMES    REWARDS    APPS    GIFT CARDS    GROUPS & EVENTS    FATHOM
PROMOS

**GQT PITTSBURGH MILLS CINEMAS**

Jobs    Contact Us    Theater Policies    Community Relations    Refunds    TheaterEars
Advertise With Us

GQT Movies. All Rights Reserved.    Ratings    Privacy    Terms & Conditions

EXHIBIT 5



Home     Movies     Food & Drinks     Events     Info



# Movie Theater Near Wayne, PA

Oaks Center Cinema is a contemporary haven for film enthusiasts. Our modern movie theater is designed to showcase films and elevate every aspect of your movie-watching experience. Residents of Wayne, PA and surrounding areas have quickly grown fond of our state-of-the-art facilities and diverse film offerings.

Oaks Center Cinema stands as a testimony to our love for movies near Wayne and Devon, PA. Each week, our movie listings are updated to ensure you have access to the latest releases, making us the go-to destination for movie buffs in the region. For those near Devon, PA, a treat awaits in the form of a unique movie experience. Learn more about why we are one of the top movie theaters in the area.

## What Concessions Do We Offer?

- Popcorn: Our popcorn is a delightful treat, popped to golden perfection and drizzled with just the right amount of buttery goodness.

- Soda: Quench your thirst with our range of fizzy sodas, chilled to perfection.

- Candy: Delight in our assortment of candies, ranging from tangy to sweet, offering a sugar rush to accompany your cinematic adventure.

- Nachos: Savor the crispy, cheesy goodness of our nachos, served with a side of fresh salsa.

- Hot dogs: Our juicy hot dogs, nestled in soft buns and topped with your choice of condiments, are the perfect savory snack.

- Ice cream: Cool down with our selection of creamy ice creams, available in a medley of flavors.





## Purchase Your Movie Tickets Online Today!

Stepping into Oaks Center Cinema is akin to embarking on a cinematic voyage, where every movie is a new adventure waiting to be explored. Our movie theater near Wayne, PA prides itself on delivering not just films, but memories that last a lifetime. We have it all for those seeking diversity in their movie choices, from the latest blockbuster to the most heartwarming indie film. We are proud to be among the top movie theaters near Devon, PA.

We invite you to explore our movie theater near Malvern, PA, a gem in the movie theater arena. We remain dedicated to providing unparalleled movie experiences across all our venues. Whether you're in Wayne, PA, Devon, PA, or a surrounding town, the silver screen at Oaks Center Cinema awaits. Secure your seat, grab your favorite concessions, and get ready for a cinematic ride like no other! Take a look at our showtimes today, and visit Oaks Center Cinema!

Connect

Follow us on Instagram and Facebook!

Hours

Our Lobby opens 30 minutes
prior to showtimes.

Oaks Center Cinema  2024 | Sitemap

Contact

**info@oakscentercinema.com**

(610) 440-3090

180 Mill Rd. Oaks, PA 19456

# EXHIBIT 6



# CINEMALL®

# Technology

## Projection equipment

All lenses in our projectors are custom made for us and are the finest quality obtainable anywhere. And we use special Xenon bulbs that are 100% brighter than standard equipment movie theater bulbs. The fact is, if we focused all our Xenon bulbs together and pointed them into the sky, their beam could be seen from the moon. And it shows, on our screens. Our patrons frequently comment that movies they see at the CINEMALL® have the brightest and sharpest pictures they've ever seen, with the richest and deepest colors they ever seen.

## Stadium Seating

Our new theaters have the steepest incline of stadium seating in any theater in SouthWest Virginia, the Tri-Cities and NorthEast Tennesse. Your seat is set one and one half vertical feet higher than the seat in front of you, assuring you of an unobstructed view of the entire screen. And each row of seating is 4 feet in depth, meaning plenty of leg extension room.

In addition, all of our theaters are equipped with wide, plush, high-back, contoured ROCKING chairs, and cup holders in the cushioned armrests. The height of each seat back is carefully designed to serve as a neck rest when one leans his or her head back.

The seats in 8 of our 12 theaters also feature the love-seat option, where the center arm rest between each seat lifts up to become part of the back rest. There is a supplemental cup holder in between the two seats making up the dual love seat.

## Sound Systems

NATIONALLY ACCLAIMED SOUND SYSTEMS

ALL of our sound systems are DIGITAL, and the Abingdon Cinemall® is the ONLY theater in Southwest Virginia, the Tri-Cities and Northeast Tennessee fully equipped with the Fly-Overhead Extended Surround Sound System designed by George Lucas and Dolby Laboratories, originally for StarWars Espisode 1.

The Cinemall® has been showcased on ABC's 'GOOD MORNING AMERICA SHOW' and designated as the best movie theater in the USA by both news media and our loyal patrons. For StarWars Episode 2 we set a national record seating patrons from 42 different states and 3 foreign countries. These distant patrons learned that the reports were true - you could literally 'feel the force flow through you'.

In addition, the Abingon Cinemall® is the ONLY theater anywhere featuring the custom-designed Hyperdrive Sound System, containing as many as 65 speakers in all of our 12 theaters, and each of which are specially configured based upon each particular movie's soundtract to deliver as much as several thousand watts of driver-power. Our patrons rely on our unique sound systems to heighten the excitement of the movie-going experience, particularly in action/adventure, sci-fi and horror movies, and we respond by delivering the highest quality of movie sight and sound - consistently, since we first opened in February of 1998.

Our theaters added in 2003 also feature thick acoustical felt-covered wall-panels, designed to absorb higher frequency sound so as to prevent that sound from bouncing or reverberating.

IF YOU ARE SOUND SENSITIVE:

For those of you who are sound-sensitive or bothered by loud sounds, and especially for very young children, we supply ear plugs at no charge. In fact, if you or anyone accompanying you are hearing sensitive or find the sound level in any particular movie we are showing to be too loud or otherwise bothersome, yet you and/or they insist on staying in the movie, we insist and strongly recommend that you and/or they wear ear-plugs, which we keep on hand at all times and distribute free-of-charge.

Further, if you or anyone accompanying you are hearing sensitive or find the sound level in any particular movie we are showing to be too loud or otherwise bothersome, we insist and strongly recommend that you and/or they exit the movie when it begins, whereupon we will give you and/or they a full refund of the ticket price paid. However, you and/or they must exit the movie within its first 15 minutes. You and/or they cannot wait beyond that point and thereafter receive a refund (although exceptions can be made in the theater manager's discretion).

This is not meant to suggest that we play our movies too loud. But some people are more hearing sensitive than others, some people are more tolerant or less tolerant of various sound volume levels, we use highly sophisticated digital surround sound equipment in all our theaters, and we do not wish to make the movie-going experience unpleasant in any way for anyone. In fact, we highly recommend that infants and very young children not be taken to see movies with loud soundtracts at our theater or at any other theater.

### 3D Features

Abingdon Cinemall is now equipped with 3D Dolby Digital Cinema in several of its auditoriums. For many years movie-goers have enjoyed a far superior surround sound experience at the Cinemall, and now the same is true for the 3D experience, as well as for the 2D Dolby Digital Cinema experience. While other digital 2D and 3D systems can be found in the area, they do not have the same high-definition resolution that the Cinemall presents to its audiences. The difference between the Cinemall®s digital cinema and others is similar to the difference between high-definition and standard definition. The Cinemall is proud to present the highest quality, premier 3D digital experience available anywhere,featuring digital 3D stereoscopic projection technology by Real D®, digital cinema by Dolby®, and digital theatrical projection by Barco®.







Accessibility

DMCA

Employment Application

Contact Us

Costumed Character Appearances

Making The Grade

Special Events

Gift Cards

Fund Raising

Advertise with us

Purchase Gift Card

Privacy settings

© 2024 The Boxoffice Company

EXHIBIT 7

📍 Fort Worth, Texas



VIEW SHOWTIMES

# MOVIES AT COYOTE DRIVE-IN FORT WORTH, TEXAS.

**Now Playing**    Coming Soon



## TRA

1 h

**Friday**

Sta



\



*We got you covered!*

## FOOD & DRINK

We are cooking up some amazing food along with all your favorite showtime treats. Choose from burgers, chicken tenders, pizzas, bbq sandwiches, even wagyu sliders. Just looking for a snack or treat, we got you with nachos, giant pretzels, hot dogs, funnel cakes, cotton candy and don't forget about the Fresh Hot Popcorn.

**See Menu**

*See you here*

## ONLY AT COYOTE DRIVE-IN FORT WORTH, TEXAS!

Let's be honest: You don't need a special reason to come in for a visit, but here are some exciting things happening at Coyote Drive-In, Fort Worth, Texas!



### NEW FRAZILS

Ongoing

Dangerously delicious. Slurp
at your own risk. Come
check out our new Frazil
trailer, 8 delicious flavors to
choose from. Way more than
just an ordinary slushie.

### NEVER MISS AN EVENT!        SUBMIT



*Skip the traditional*

## HOST YOUR PRIVATE EVENT WITH US!

Make it the place for your next birthday party where we reserve space for your guests and
cake or rent the facility for a corporate event where you use our screens to deliver your
branding and employee message along with a follow-on film to cap off a great
experience. When looking for where to host your next private event, do it with the
seasoned experts at Coyote Drive In. We can help you eliminate the stress of planning a
large event, from food packages to entertainment options, no event is too large, you
imagine it, we will make it happen.

Let´s do it!

---

*Hey! Here's what you need to know*

## ABOUT COYOTE DRIVE-IN, FORT WORTH, TEXAS



### Bright Screens

While the sun still needs to set. Movies at Coyote are delivered using laser film projection which delivers high definition bright lit experience to see all the action on the screen.



### Food Delivery

Download our app and instead of waiting in line while the movie gets started, log on an select from our great menu of food and drink.



### Pet Friendly

Here at Coyote Drive In we always welcome your furry family members. They want to experience the excitement we have to offer. Just make sure they stay on a leash for safety.



### Kids Playground

Brings the kids and let them loose in our enclosed playground. Let them burn off all that built energy before the show. Great time for the little ones.

## Live Music

Coyote is a community experience. On the weekends come out for some live music before the show and eat food from locally owned food trucks exclusively at Coyote.

Learn about our space, parking, food, house rules, and more!

**Let´s do it!**

*The best film, food, and drinks in Fort Worth, Texas.*

# COME JOIN US!

**VIEW SHOWTIMES**

**SEE MOVIES**

## WELCOME

**NOW PLAYING**

**COMING SOON**

**CANTEEN & DELIVERY**

**ONLY AT COYOTE DRIVE-IN**

**HOST YOUR EVENT**

**HOUSE RULES**

## GET IN TOUCH

**EMAIL US**

Phone: +1 (817) 717-7767

## VISIT US

Gates Open
Mon – Thurs 6:30pm
Friday – Sunday 6:00pm

223 NE 4th Street
Fort Worth, TX 76164

## STAY IN THE LOOP

| Enter your email | SUBMIT |